STATE OF NORTH CAROLINA v. ELRICO DARNELL FOWLER

No. 164A00

(Filed 20 July 2001)

### 1. Evidence— hearsay—unavailable declarant

The trial court did not err in a capital trial by admitting an unavailable victim's hearsay statements to two officers under N.C.G.S. § 8C-1, Rule 804(b)(5), because: (1) the State could not procure the declarant's presence by process or other reasonable means since the victim moved to India and indicated he would not return to the United States based on his injuries and the fact that he feared for his life in America; (2) the State provided timely written notice of its intent to offer the statements at trial;

(3) the State's failure to supply an address for the victim was acceptable under the circumstances; (4) the trial court concluded the victim's statements had sufficient guarantees of trustworthiness; (5) the proffered statement was offered as evidence of a material fact; (6) the trial court concluded the statements were more probative on the point for which they were offered than any other available evidence; and (7) the trial court concluded the admission of the statements would serve the interests of justice.

## 2. Constitutional Law— right to confront witnesses—unavailable declarant

The trial court did not violate defendant's confrontation rights in a capital trial by admitting an unavailable victim's hearsay statements to two officers, because: (1) the factors considered in reviewing the admissibility of the statements under N.C.G.S. § 8C-1, Rule 804(b)(5) equally demonstrate the admissibility of the statements under the Confrontation Clause since they show the statements are both necessary and reliable; and (2) an independent review of the record reveals that the statements contain numerous guarantees of trustworthiness including that the victim was an eyewitness to the shooting and spoke from personal knowledge, the victim was motivated to aid in the quick capture of the perpetrator when he was extremely frightened and feared further violence, the victim never recanted his version of the attack, and the victim did not make his statements to receive any benefit from the State or to avoid prosecution.

## 3. Identification of Defendant— in-court—suggestiveness of identification procedure

A witness's in-court identification of defendant in a capital trial did not deprive him of his due process rights even though defendant contends the identification was the result of an impermissibly suggestive procedure based on the cumulative effect of viewing photographic arrays and meeting with prosecutors, because: (1) the trial court found the witness's identification was based on his independent recollection of defendant from the night of the crimes; (2) the record reveals that prosecutors told the witness when they met with him before the pretrial hearing that he should tell the truth if he did not recognize defendant; (3) nothing suggests that the prosecutors encouraged the witness to make a false identification; (4) although prosecutors should avoid instructing the witness as to defendant's location in the

courtroom, there is insufficient evidence to support defendant's contention that prosecutors rigged the identification; and (5) the in-court identification was not the only evidence pointing to defendant's guilt.

**4. Evidence— potentially exculpatory statement—defendant did not commit the crimes**

The trial court did not abuse its discretion in a capital trial by excluding a potentially exculpatory statement defendant made to another witness in jail concerning whether defendant said that he did not commit the crimes at issue after the witness testified that he told defendant the gun he had purchased from defendant had been destroyed, and defendant said he was glad and for the witness not to tell anyone about the gun, because: (1) defendant's self-serving statement of innocence was unnecessary for an understanding of the testimony about the gun; and (2) it is unclear whether defendant's statements about the gun and his assertion of innocence were part of the same verbal transaction.

**5. Robbery— dangerous weapon—motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the robbery with a dangerous weapon charge for one of the victims even though defendant concedes the evidence was sufficient to prove he stole the motel's money, because the State's evidence showed that: (1) the victim habitually carried cash in his wallet; (2) the victim's wallet, business cards, and birth certificate were lying by his side at the crime scene; and (3) the wallet contained no money.

**6. Robbery— dangerous weapon—jury instruction**

The trial court did not commit plain error in its jury instructions concerning the robbery with a dangerous weapon of one of the victims even though defendant contends the instruction allowed the jury to convict him of this charge based solely on the taking of the motel's money, because: (1) the instructions read as a whole adequately explain the different requirements for each robbery charge; and (2) the trial court made clear that defendant had to take the motel's property to be guilty of the first robbery count and had to take the victim's property to be guilty of the second robbery count.

**7. Sentencing— capital—aggravating circumstance—murder commited to avoid lawful arrest**

The trial court did not err in a capital sentencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(4) aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest or escaping from custody, because: (1) no evidence exists to show that the victim either posed a threat to defendant or tried to resist during the robbery; (2) defendant shot the victim from behind at close range with a .44-caliber handgun; and (3) the victim was on the ground at the time of the shooting.

**8. Sentencing— capital—death penalty—proportionate**

The trial court did not err by sentencing defendant to the death penalty for a first-degree murder, because: (1) defendant was convicted on the basis of malice and premeditation and deliberation and under the felony murder rule; (2) defendant shot a helpless man who was lying on the floor and who was in no way resisting defendant's robbery; and (3) the jury found the N.C.G.S. §§ 15A-2000(e)(5) and (e)(11) aggravating circumstances, either of which standing alone have been held sufficient to support the death penalty.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Bridges, J., on 14 November 1997 in Superior Court, Mecklenburg County, upon a jury verdict finding defendant guilty of first-degree murder. On 31 January 2001 the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 13 February 2001.

*Roy A. Cooper, Attorney General, by William B. Crumpler, Assistant Attorney General, for the State.*

*James R. Glover for defendant-appellant.*

MARTIN, Justice.

On 29 January 1996 the state indicted defendant Elrico Darnell Fowler (defendant) for the first-degree murder of Bobby Richmond. The state also indicted defendant for assault with a deadly weapon with intent to kill inflicting serious injury and two counts of robbery with a dangerous weapon. Defendant was tried capitally at the 13

**STATE v. FOWLER**

[353 N.C. 599 (2001)]

October 1997 Criminal Session of Superior Court, Mecklenburg County. The jury found defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. The jury also found defendant guilty of both counts of robbery with a dangerous weapon and one count of assault with a deadly weapon with intent to kill inflicting serious injury. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction. The trial court entered judgment in accordance with that recommendation. The trial court also sentenced defendant to terms of imprisonment for his remaining convictions.

The evidence at trial is summarized as follows: On 31 December 1995 at approximately 10:45 p.m., Bobby Richmond (Richmond), an employee at a Howard Johnson's Motel in Charlotte, North Carolina, entered the motel lobby looking for ice. Bharat Shah (Shah) was working as the motel night clerk. About five minutes later, two black males entered the motel and approached the check-in counter. One of the men pulled out a gun and ordered Richmond to get on the ground. The other man ordered Shah to "open the register and give [him] the money." While Shah was handing over the money, the man with the gun shot both Richmond and Shah. He then ordered Shah to open the office safe. When Shah stated he did not have the combination, the man shot Shah again. Both assailants then fled the motel.

The Charlotte-Mecklenburg Police arrived at the scene at 11:04 p.m. and found Richmond and Shah lying near the counter. Richmond was unresponsive. Shah was struggling to speak with police. He told the police they had been robbed by two black males, one wearing a green jacket.

When paramedics arrived, they found a large wound in the middle of Richmond's back. Richmond had no carotid pulse. The paramedics determined Shah's life was in danger. A hospital surgeon later found two wounds in Shah's left thigh, two more wounds in Shah's back, and a wound in Shah's right forearm.

A high-velocity weapon caused Shah's thigh injury. Doctors removed two .44-caliber bullet jacket fragments from his forearm during surgery. A .44-caliber bullet jacket was also found in Richmond's left lung. Police located a .44-caliber bullet core in the motel carpet beneath Richmond's chest wound. Police also found a .44-caliber bullet jacket and a large fragment from a .44-caliber bullet jacket at the scene. Both had been fired from the same weapon used

to shoot Richmond. Other pieces of metal found at the scene were also consistent with .44- caliber ammunition.

Richmond had an entrance wound in his back and an exit wound in his chest. His chest was against a hard surface when he was shot. The evidence showed Richmond was likely shot from a distance of no more than three feet.

Officers found Richmond's wallet at the scene next to his body. The wallet contained no money. The cash register drawer and a plastic change drawer next to the register also contained no money. Approximately $300.00 was stolen from the motel during the robbery.

Jimmy Guzman (Guzman), the owner of a restaurant in the motel lobby, heard gunshots around 11:00 p.m. Guzman looked through the glass door of his restaurant and saw an individual standing behind the check-in counter, looking down. Guzman said the man was black, in his late twenties, and approximately six feet tall. The man was wearing a green toboggan and a camouflage army jacket. The man had a pointed nose and hair on his face but not a full beard. Shortly after the robbery, police showed Guzman a man in a green jacket, but he was unable to say whether this was the man from the motel.

On 8 January 1996 police showed Guzman a photo array which included a 1995 photo of defendant with a full beard. Guzman said none of the men looked like the one he saw in the motel. On 11 January 1996 police showed Guzman a second photo array with a picture of another suspect. Guzman said the picture of the other suspect resembled the man he had seen at the crime scene.

On 14 January 1996 police showed Guzman another photo array produced by a computer. It included a picture taken two days earlier of defendant with a slightly unshaven face. Guzman picked out defendant's picture as the one most closely resembling the man at the motel. He was unable to state for sure, however, that defendant was the man he had seen. On 3 April 1996 police showed Guzman another photo array, without a picture of defendant. Guzman selected two photos resembling the man he had seen.

Before the pretrial hearing on 14 October 1997, the prosecutor told Guzman that at any proceeding where he was called to testify, defendant would be seated between his attorneys at the defense table. At the pretrial hearing, Guzman identified defendant as the man he had seen. Guzman said this identification was based on his mem-

**STATE v. FOWLER**

[353 N.C. 599 (2001)]

ory of seeing defendant at the crime scene. At trial, Guzman again identified defendant as the man he had seen.

On 1 January 1996 at approximately 4:00 p.m., Sergeant Diego Anselmo visited Shah in the hospital. Shah provided an account of the robbery and shootings. Shah said Richmond entered the lobby looking for ice around 10:45 p.m. Shah described the two men who entered the motel and robbed and shot him as black males around twenty-five or twenty-six years old, thinly built, and approximately 5'7" tall. He said both individuals wore red ski caps with black stripes. One man, wearing a gray and black flannel shirt, asked for a room. The other man, wearing a red flannel shirt, removed a revolver from his waistband and ordered Richmond onto the ground. The man with no gun ordered Shah to open the register and give him the money. As Shah complied, the man in the red shirt shot Richmond and Shah. The man with the gun ordered Shah to open the safe. When Shah stated that he did not have the combination, the man shot Shah again. Both individuals then fled.

On 8 January 1996 Investigator Christopher Fish (Investigator Fish) interviewed Shah. During this interview Shah provided additional details about the robbery. Shah stated he gave one of the men approximately $300.00 out of the register. The man to whom he handed the money was a black male with small eyes and a goatee, and was approximately the same height as Shah, about 5'4". This man was wearing a black checked flannel shirt and dark toboggan. Shah stated that the man at the end of the counter with the gun was also black and looked similar to his accomplice although he was a little taller. This man had unshaven hair on his face but not a full beard. The man was wearing a red checked flannel shirt and dark toboggan. Shah thought the gun was black and about six inches long. The man shot Richmond first and then shot Shah in the leg. Investigator Fish showed photographs to Shah at the interview, and one of the photographs depicted defendant with a full beard. Shah said during the interview that he did not get a good look at the shooter because he was primarily focused on the man taking the money. Shah said he probably could not recognize the suspects.

Shah was released from the hospital on 14 January 1996 and eventually moved to India. The state made repeated attempts to locate Shah. Investigator Sam L. Price (Investigator Price), an investigator with the Charlotte-Mecklenburg Police Department, spoke to Shah's brother in California as early as September 1996. Investigator Price obtained Shah's telephone number in India and spoke to Shah

by phone in October 1996. Investigator Price told Shah that the state would provide him with air transportation, lodging, meals, and whatever was necessary to care for his injuries if he would return to North Carolina to testify. Investigator Price further promised that Shah would be picked up in California and provided police protection while in Charlotte. Despite the state's offer to pay for his air transportation, accommodations, and meals, as well as to provide police protection, Shah refused to return to the United States to testify at trial.

The state provided defendant with written notice of its intent to offer Shah's hearsay testimony at defendant's trial. In the state's initial notice, the state recited that Shah was living at an unknown address in India. The state later served defendant with an amended notice that included Shah's telephone number in India.

Several people testified concerning defendant's statements and actions before and after the events at the motel. Jermale Jones (Jones) said defendant told him on Thanksgiving 1995 about a potential plot to rob a Howard Johnson's Motel. Further, while incarcerated with Jones in the Mecklenburg County jail in March 1996, defendant told Jones that he entered the Howard Johnson's with a handgun to attempt a robbery and that when the people working at the motel made him ask twice for the money, defendant shot them. Defendant said the gun he used was "a big old .44."

Edward Adams (Adams) testified that he saw defendant at an apartment around 8:00 p.m. on 31 December 1995. Defendant left between 9:00 and 10:00 p.m. with two other men and returned between midnight and 1:00 a.m. Defendant stated he was going to the Sugar Shack, a local nightclub, and left with some other people. On the evening of 1 January 1996, Adams purchased a .44-caliber revolver from defendant. The gun was destroyed the next day. In April 1996 defendant spoke with Adams while they were both incarcerated. Defendant asked Adams where the gun was located, and Adams told him the gun had been destroyed. Defendant responded, "I'm glad," and asked Adams not to tell people about the gun. Defendant also told Adams that the district attorney did not know the identity of the person who purchased the gun.

Leo McIntyre, Jr. (McIntyre) testified that he went to the Sugar Shack on 31 December 1995 and spoke with defendant. Defendant was dressed in army fatigues. Defendant told McIntyre that he shot two people during a robbery at a Howard Johnson's. Defendant also

stated that he only got two or three hundred dollars and was now broke because he had paid for his friends to get into the club. Later on that week, McIntyre saw defendant at a car wash. Defendant told him then that, although he thought he had killed both people at the robbery, one of them had lived.

Waymon Fleming (Fleming) lived with defendant in December 1995. Defendant told Fleming that he robbed the motel, obtained money from the cash register, and then shot people who would not open the safe. Several days later, defendant informed Fleming of his plan to flee the state. Fleming relayed this information to law enforcement officers, and defendant was eventually apprehended.

Charlotte-Mecklenburg Police Officer James Saunders and Federal Bureau of Investigation Special Agent David Martinez met with Shenitra Johnson (Johnson) on 11 January 1996. Johnson told them defendant arrived at her house shortly after 11:30 p.m. on 31 December 1995 and left between 12:30 and 1:00 a.m. She also stated that when defendant came over to Johnson's residence, he had a .44-caliber gun, which he later sold. However, at trial Johnson testified that defendant arrived at her home around 10:30 p.m. and did not leave until sometime between 1:15 and 1:30 a.m. She further testified that she never saw defendant selling or trying to sell a handgun at her apartment.

Additional facts will be provided below as necessary.

## GUILT-INNOCENCE PHASE

[1] Defendant first contends the trial court erred by admitting Shah's hearsay statements to Sergeant Anselmo on 1 January 1996 and Investigator Fish on 8 January 1996. Defendant argues these statements were improperly admitted in violation of North Carolina Rule of Evidence 804(b)(5) and his right to confrontation under the Sixth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution. Defendant also contends the admission of the challenged statements violated his constitutional due process rights and his constitutional protections from cruel and unusual punishment.

At the outset we note that defendant has waived appellate review of his cruel and unusual punishment claims. Defendant raises these constitutional claims in his assignments of error and questions presented. Nonetheless, he has not argued these claims in his brief or otherwise provided any authority supporting these contentions.

Accordingly, defendant has waived review of these claims. *See* N.C. R. App. P. 28(a) ("Questions raised by assignments of error in appeals from trial tribunals but not then presented and discussed in a party's brief[] are deemed abandoned."); N.C. R. App. P. 28(b)(5) ("Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned."); *State v. Kilpatrick*, 343 N.C. 466, 475, 471 S.E.2d 624, 630 (1996).

Defendant contends that the trial court erred in admitting Shah's out-of-court statements under N.C. R. Evid. 804(b)(5) and that their admission violated his Sixth Amendment right to confront the witnesses against him. We disagree.

Rule 804 provides in pertinent part:

(b) **Hearsay exceptions**. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(5) *Other Exceptions*. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

N.C.G.S. § 8C-1, Rule 804(b)(5) (1999).

In *State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736 (1986), this Court enunciated the guidelines for admission of hearsay testimony under Rule 804(b)(5). First, the trial court must find that the declarant is

unavailable. Second, the trial court must conduct a six-prong inquiry to determine admissibility. *Id.* at 9, 340 S.E.2d at 741. The trial court must consider the following:

(1) Whether the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and of its particulars;

(2) That the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4);

(3) That the statement possesses "equivalent circumstantial guarantees of trustworthiness";

(4) That the proffered statement is offered as evidence of a material fact;

(5) Whether the hearsay is "more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable means"; and

(6) Whether "the general purposes of [the] rules [of evidence] and the interests of justice will best be served by admission of the statement into evidence."

*State v. Ali*, 329 N.C. 394, 408, 407 S.E.2d 183, 191-92 (1991) (quoting N.C.G.S. § 8C-1, Rule 804(b)(5)); *see also Triplett*, 316 N.C. at 9, 340 S.E.2d at 741.

At a pretrial evidentiary hearing on 15-16 October 1997, the trial court heard evidence relevant to the admissibility of Shah's statements to Sergeant Anselmo and Investigator Fish. Following this hearing the trial court determined that Shah was unavailable and made conclusions of law concerning each of the six *Triplett* prongs. On the basis of these conclusions, the trial court ruled that Shah's statements were admissible. Defendant argues that Shah's statements were insufficiently reliable to meet the evidentiary and constitutional requirements for admission at trial. Defendant further contends that the trial court's conclusion concerning Shah's unavailability was not supported by the evidence.

Rule 804 provides in pertinent part:

(a) **Definition of Unavailability.** "Unavailability as a witness" includes situations in which the declarant:

. . . .

**STATE v. FOWLER**

[353 N.C. 599 (2001)]

(5) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . by process or other reasonable means.

N.C.G.S. § 8C-1, Rule 804(a)(5).

The trial court concluded that Shah was unavailable based on the following findings of fact. After the shooting Shah went to California and lived with his brother, visited India, returned to the United States, and then moved back to India on a permanent basis. State officials attempted to locate Shah in preparation for trial and learned he was living in India. Shah informed the officials that there was nothing they could do to make him return to the United States and testify. Shah also stated that he would not testify because of (1) continual pain and disability from his gunshot injuries which made it difficult for him to travel, and (2) his fear for his life in America.

In *State v. Bowie*, 340 N.C. 199, 207, 456 S.E.2d 771, 775, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 435 (1995), the declarant made a statement to police and then moved to Philadelphia. Prior to trial, the state obtained an order from the trial court compelling the declarant to "be taken into custody and delivered to a North Carolina officer to assure her attendance at the trial." *Id.* When officers attempted to take the declarant into custody, she was not at her stated address. *Id.* The declarant's mother told the officers that the declarant had moved and that she did not know the declarant's new address or telephone number. *Id.* The Court held that the evidence of record was sufficient to support the trial court's finding that the state could not procure the declarant's presence by process or other reasonable means. *Id.*

In the present case, as in *Bowie*, the state was unable to determine the declarant's exact address. Further, Shah refused to attend the proceedings because of his injuries and fear for his safety. The trial court's detailed findings of fact are sufficient to support its conclusion that Shah was unavailable.

After establishing unavailability, the trial court considered the six-prong *Triplett* inquiry to determine admissibility. *Triplett*, 316 N.C. at 9, 340 S.E.2d at 741; *State v. Smith*, 315 N.C. 76, 92-97, 337 S.E.2d 833, 844-47 (1985).

Under the first prong, the trial court must determine whether the proponent of the hearsay testimony provided proper notice to the adverse party of its intent to offer the testimony and the particulars

of the evidence. *Smith*, 315 N.C. at 92, 337 S.E.2d at 844. The state must provide defendant with written notice of its intent to offer the statements in adequate time for defendant to have a fair opportunity to meet the statements. *Triplett*, 316 N.C. at 12, 340 S.E.2d at 743. The notice requirement should be construed "somewhat flexibly, in light of the express policy of providing a party with a fair opportunity to meet the proffered evidence." *Id.* at 12-13, 340 S.E.2d at 743.

Based on the following findings of fact, the trial court concluded that the state provided timely written notice of its intent to offer Shah's statements at trial: (1) the state filed written notice of its intent to offer the statements approximately one month prior to the pretrial hearing; (2) the state attached to that notice a copy of one of Shah's statements as well as an officer's notes concerning the other statement, *see State v. Nichols*, 321 N.C. 616, 623, 365 S.E.2d 561, 565 (1988) (finding relevancy in defendant's receipt of the declarant's statement well in advance of trial); and (3) the state filed an amended notice on 2 October 1997 providing defendant with a telephone number for Shah and indicating that Shah was living at an unknown address in India. These findings were sufficient to support the trial court's conclusion that the state provided adequate notice of its intent to offer Shah's statements into evidence at trial.

We believe the state's failure to supply an address for Shah was acceptable under the present circumstances. Investigator Price spoke with Shah's brother in California, obtained Shah's telephone number in India, and telephoned Shah at this number. Having confirmed the accuracy of the telephone number provided by Shah's brother, the state provided defendant with this contact information. Obviously, the state could not provide what it did not have but nonetheless provided defendant with a reliable means to contact Shah. Accordingly, the state's failure to produce Shah's address in India did not deny defendant a fair opportunity to meet the evidence at trial.

The trial court next considered, under the second prong, whether the statements made by Shah in the hospital to Sergeant Anselmo and Investigator Fish were covered by any of the other hearsay exceptions listed in Rule 804(b)(1)-(4). *See State v. Deanes*, 323 N.C. 508, 515, 374 S.E.2d 249, 255 (1988), *cert. denied*, 490 U.S. 1101, 104 L. Ed. 2d 1009 (1989). Although the trial court found that Shah's statements to police at the crime scene could be admitted under other hearsay exceptions, it determined that the statements made at the

hospital did not fall under any other exception. Defendant has not shown that the trial court's analysis and conclusion on this issue were improper.

Next, the trial court considered whether, under the third prong, the challenged statements possessed " 'guarantees of trust-worthiness' that are equivalent to the other exceptions contained in Rule 804(b)." *State v. McLaughlin*, 316 N.C. 175, 179, 340 S.E.2d 102, 104 (1986). This Court has directed the trial court to consider the following factors when analyzing this question: (1) the declarant's personal knowledge of the underlying event, (2) the declarant's motivation to speak the truth, (3) whether the declarant recanted, and (4) the practical availability of the declarant at trial for meaningful cross-examination. *State v. Tyler*, 346 N.C. 187, 195, 485 S.E.2d 599, 603 (citing *Triplett*, 316 N.C. at 10-11, 340 S.E.2d at 742), *cert. denied*, 522 U.S. 1001, 139 L. Ed. 2d 411 (1997).

In the present case, the trial court concluded that Shah's statements had sufficient guarantees of trustworthiness. This conclusion was premised on the trial court's detailed findings of fact that: (1) Shah had personal knowledge of the robbery and shooting as an eye-witness to the entire event, *compare Tyler*, 346 N.C. at 199, 485 S.E.2d at 605 (holding declarant's hearsay testimony that defendant set her on fire was properly admitted pursuant to Rule 804(b)(5) when the deceased declarant made statements to police in the hospital from her personal knowledge and had no reason to lie and never recanted the statement), *with State v. Swindler*, 339 N.C. 469, 450 S.E.2d 907 (1994) (holding hearsay statements were improperly admitted where the declarant had no personal knowledge of the events described in the letter the proponent sought to admit, the declarant refused to acknowledge writing the letter, the declarant refused to testify, the letter incriminated the defendant, and the declarant was motivated to talk to obtain a deal with police); (2) Shah was motivated to speak truthfully to law enforcement officers to facilitate defendant's immediate capture, *see Triplett*, 316 N.C. at 10-12, 340 S.E.2d at 742; *State v. Brown*, 339 N.C. 426, 437-38, 451 S.E.2d 181, 188 (1994), *cert. denied*, 516 U.S. 825, 133 L. Ed. 2d 46 (1995); (3) Shah never recanted his account or description of the events in any way, *see Tyler*, 346 N.C. at 199, 485 S.E.2d at 605; (4) Shah had no specific relationship with defendant or police that would encourage him to provide anything other than a truthful statement, *see Triplett*, 316 N.C. at 11, 340 S.E.2d at 742; *Brown*, 339 N.C. at 437, 451 S.E.2d at 188; and (5) in consideration of Shah's availability for cross-examination, com-

pelling Shah's attendance at trial provided huge and insurmountable obstacles, *see State v. Chapman*, 342 N.C. 330, 341-42, 464 S.E.2d 661, 667-68 (1995) (holding the trial court properly considered the state's unsuccessful attempts to find the declarant), *cert. denied*, 518 U.S. 1023, 135 L. Ed. 2d 1077 (1996); *see also Triplett*, 316 N.C. at 11, 340 S.E.2d at 742. These findings are sufficient to support the trial court's conclusion that Shah's statements possessed sufficient guarantees of trustworthiness for admission at defendant's trial. We further note that the principal reasons for Shah's unavailability appear to be the difficulty of the long journey and his fear for his life. Such reasons do not suggest any improper motivation to avoid testifying, and they support the trial court's conclusion that Shah's statements were trustworthy.

Next, under the fourth *Triplett* prong, the trial court determined that the proffered statement was offered as evidence of a material fact. *See Smith*, 315 N.C. at 94-95, 337 S.E.2d at 845. The trial court concluded that Shah's statements were material because the statements described the assailants and the details of the crime. Accordingly, this prong of the inquiry is fully satisfied.

The trial court next considered whether, under the fifth prong, Shah's statements were more probative on the point for which they were offered than other available evidence. "Th[is] requirement imposes the obligation of a dual inquiry: were the proponent's efforts to procure more probative evidence diligent, and is the statement more probative on the point than other evidence that the proponent could reasonably procure?" *Smith*, 315 N.C. at 95, 337 S.E.2d at 846. The trial court first concluded that Shah's hearsay statements were more probative than any other evidence because Shah was the only surviving victim of the crimes, Shah was the only eyewitness to the entire event, and Shah was the closest person to the assailants and therefore had the best opportunity to observe them. The trial court also found that the state was diligent in its efforts to produce Shah's presence at defendant's trial and concluded that it was practically impossible to return Shah to this country to testify.

Defendant argues, however, that the trial court failed to adequately consider the first prong of the two-part probativeness inquiry outlined in *Smith*, which requires a showing that the proponent's efforts to procure more probative evidence were diligent. *Id.* Defendant further contends that the state's lack of diligence denied defendant the opportunity to cross-examine Shah.

Contrary to defendant's contention, the trial court's findings support a conclusion that the state acted diligently in trying to produce Shah to testify. Although the live testimony of the hearsay declarant will ordinarily be more probative than his prior statement, *see id.*, the trial court specifically found that it was practically impossible to return Shah to this country to testify. The trial court made the following findings of fact to support its conclusion: (1) state officials contacted Shah in India, and Shah informed them there was no way he would return to the United States to testify; (2) Shah was not willing to return to this country because his painful injuries made travel difficult and he feared for his safety; (3) the state spoke numerous times with Shah's brother in California in attempts to locate Shah; (4) the state offered to provide Shah with police protection during his stay; and (5) the state offered to pay for Shah's airfare, lodging, meals, and care for his injuries during his stay. These facts are sufficient to support the trial court's conclusion that the state's efforts to produce Shah were diligent.

The final inquiry under the six-prong *Triplett* analysis is whether the admission of the hearsay statements serves the interests of justice and the general purpose of the rules of evidence. *Smith*, 315 N.C. at 96, 337 S.E.2d at 846-47. The trial court concluded that admission of Shah's statements would serve the interests of justice. It considered numerous factors, including that Shah's prior inability to identify defendant could be raised during cross-examination of the witnesses through whom Shah's statements would be introduced. The trial court thus determined that Shah's statements would not be unduly prejudicial to defendant. Defendant has not shown error in the trial court's analysis.

Accordingly, the witness has been properly deemed to be unavailable, and the trial court satisfied all six prongs of the *Triplett* analysis. We find no error in the admission of the victim's hearsay statements under Rule 804(b)(5).

[2] We also reject defendant's contention that the admission of Shah's hearsay statements violated his right to confrontation. Under the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The North Carolina Constitution provides a similar right. N.C. Const. art. I, § 23; *see also State v. Chandler*, 324 N.C. 172, 178-79, 376 S.E.2d 728, 733 (1989). This Court has generally construed the right to confrontation under our state constitution consistent with the federal

provision. *See, e.g., State v. Jackson*, 348 N.C. 644, 653-54, 503 S.E.2d 101, 107 (1998); *Deanes*, 323 N.C. at 514-25, 374 S.E.2d at 254-61.

This Court uses a two-part test to determine whether statements admissible under a hearsay exception violate the Confrontation Clause. *Ohio v. Roberts*, 448 U.S. 56, 65, 65 L. Ed. 2d 597, 607 (1980); *Deanes*, 323 N.C. at 525, 374 S.E.2d at 260. First, the prosecution must "either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use." *Roberts*, 448 U.S. at 65, 65 L. Ed. 2d at 607. This prong of the *Roberts* inquiry is called the "Rule of Necessity." *Id.* In analyzing this prong, " '[a] witness is not "unavailable" for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.' " *Id.* at 74, 65 L. Ed. 2d at 613 (quoting *Barber v. Page*, 390 U.S. 719, 724-25, 20 L. Ed. 2d 255, 260 (1968)) (alterations in original).

The second prong of the *Roberts* analysis requires the prosecutor to show that the statements at issue have sufficient "indicia of reliability." *Id.* at 66, 65 L. Ed. 2d at 607. Assuming testimony falls within a "firmly rooted" hearsay exception, this reliability is presumed without more. *Id.* at 66, 65 L. Ed. 2d at 608. Testimony that does not fall within a "firmly rooted" exception, however, will be excluded absent a showing of particularized guarantees of trustworthiness drawn from the totality of the circumstances surrounding the statements. *Idaho v. Wright*, 497 U.S. 805, 818-19, 111 L. Ed. 2d 638, 654-55 (1990); *see also Tyler*, 346 N.C. at 200, 485 S.E.2d at 606. The United States Supreme Court has stated that residual hearsay exceptions such as Rule 804(b)(5) are not firmly rooted. *Wright*, 497 U.S. at 817, 111 L. Ed. 2d at 653; *Tyler*, 346 N.C. at 200, 485 S.E.2d at 606; *State v. Felton*, 330 N.C. 619, 643, 412 S.E.2d 344, 359 (1992).

This Court recently stated that the two-part *Roberts* test is incorporated within the trustworthiness and probativeness prongs of the six-part inquiry from *Smith* and *Triplett*. *Brown*, 339 N.C. at 439, 451 S.E.2d at 189; *Deanes*, 323 N.C. at 525, 374 S.E.2d at 260. In the present case, the factors considered in reviewing the admissibility of Shah's statements under Rule 804(b)(5) equally demonstrate the admissibility of the statements under the Confrontation Clause because they show Shah's statements are both necessary and reliable. *Brown*, 339 N.C. at 439, 451 S.E.2d at 189.

The United States Supreme Court recently stated, however, that in analyzing "whether the admission of a declarant's out-of-court

statements violate the Confrontation Clause, courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause." *Lilly v. Virginia,* 527 U.S. 116, 137, 144 L. Ed. 2d 117, 134 (1999). Accordingly, we have conducted a full and independent review to determine whether Shah's statements contained sufficient "particularized guarantees of trustworthiness" for admission consistent with the Confrontation Clause. *Id.* at 125, 144 L. Ed. 2d at 127.

Upon careful review of the record, we have determined that Shah's statements contain numerous guarantees of trustworthiness. As indicated above, Shah was an eyewitness to the shooting and thus spoke from personal knowledge. Further, Shah was apparently extremely frightened that he might be the victim of further violence and was thus motivated to speak truthfully to law enforcement officers to aid in the quick capture of the perpetrator. Shah never recanted his version of the attack. Moreover, Shah did not make his statements to receive any benefit from the state or to avoid prosecution. Accordingly, based on our independent review of the record, we conclude that Shah's statements contained "particularized guarantees of trustworthiness." We thus reject defendant's contention that admission of Shah's hearsay statements violated the Sixth Amendment Confrontation Clause.

[3] Defendant next argues that Guzman's in-court identification deprived defendant of his rights to due process and freedom from cruel and unusual punishment. Before trial, defendant moved to suppress any in-court identification by Guzman. The trial court denied this motion and permitted Guzman to identify defendant at a pretrial hearing and at trial.

As noted earlier in this opinion, defendant advances no argument concerning cruel and unusual punishment in his brief. Accordingly, this argument is deemed abandoned. *See* N.C. R. App. P. 28(a), (b)(5).

As to due process, defendant argues that Guzman's in-court identification was influenced by viewing several photographic lineups and receiving instruction from prosecutors before court on how to identify defendant. Defendant notes that Guzman was never able to identify him confidently in photographic lineups prior to trial and in fact sometimes picked other people out of the lineups. Further, prior to the pretrial hearing, prosecutors met with Guzman, told him defendant's name, and instructed him that defendant would be seated

at the defense table between his attorneys. Thus, defendant contends the in-court identification violated his due process rights.

Defendant assigns special significance to the trial court's finding that:

Mr. Guzman indicated his identification of the Defendant in open Court [was] based upon his recollection of the appearance of the Defendant as being the person behind the counter at Howard Johnson's Motel on December 31st, 1995 and not based upon any suggestion or inference in conferences with the police officers or with prosecuting attorneys.

Defendant contends that the last portion of this finding is not supported by the evidence because Guzman never stated whether his in-court identification was influenced by conferences with police or prosecutors. Indeed, defendant argues the trial court never adequately considered whether the state's instructions to Guzman were overly suggestive.

In analyzing defendant's arguments, we must consider whether the identification procedure was so suggestive as to create a substantial likelihood of irreparable misidentification. *United States v. Marson*, 408 F.2d 644, 650 (4th Cir. 1968), *cert. denied*, 393 U.S. 1056, 21 L. Ed. 2d 698 (1969); *State v. Simpson*, 327 N.C. 178, 186, 393 S.E.2d 771, 776 (1990); *State v. Hannah*, 312 N.C. 286, 290, 322 S.E.2d 148, 151 (1984). If so, the identification should be suppressed on due process grounds. *Simpson*, 327 N.C. at 186, 393 S.E.2d at 776. This due process analysis requires a two-part inquiry. First, the Court must determine whether the identification procedures were impermissibly suggestive. *State v. Powell*, 321 N.C. 364, 368-69, 364 S.E.2d 332, 335, *cert. denied*, 488 U.S. 830, 102 L. Ed. 2d 60 (1988); *Hannah*, 312 N.C. at 290, 322 S.E.2d at 151; *State v. Headen*, 295 N.C. 437, 439, 245 S.E.2d 706, 708 (1978). Second, if the procedures were impermissibly suggestive, the Court must then determine whether the procedures created a substantial likelihood of irreparable misidentification. *Powell*, 321 N.C. at 369, 364 S.E.2d at 335; *Hannah*, 312 N.C. at 290, 322 S.E.2d at 151; *Headen*, 295 N.C. at 439, 245 S.E.2d at 708.

The test under the first inquiry is "whether the totality of the circumstances reveals a pretrial procedure so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice." *Hannah*, 312 N.C. at 290, 322 S.E.2d at 151. "[T]he viewing of a defendant in the courtroom dur-

ing the various stages of a criminal proceeding by witnesses who are offered to testify as to identification of the defendant is not, of itself, such a confrontation as will taint an in-court identification unless other circumstances are shown which are so 'unnecessarily suggestive and conducive to irreparable mistaken identification' as would deprive defendant of his due process rights." *State v. Covington*, 290 N.C. 313, 324, 226 S.E.2d 629, 638 (1976) (quoting *Hannah*, 312 N.C. at 292, 322 S.E.2d at 152).

In the present case, the trial court made extensive findings concerning the photographic arrays shown to Guzman and concluded that Guzman's in-court identification was based on his independent recollection of defendant from the night of the crimes. The trial court's findings of fact are binding on appeal when supported by competent evidence. *Hannah*, 312 N.C. at 291, 322 S.E.2d at 151-52. There is ample evidence in the present record to support the trial court's findings. Guzman testified he was confident that defendant was the man he saw in the motel lobby on 31 December 1995. Guzman stated that his identification was based on his memory of seeing defendant in person in the motel lobby on the night of the shootings and not on seeing photographs of defendant. Moreover, the record reveals prosecutors told Guzman when they met with him before the pretrial hearing that he should tell the truth if he did not recognize defendant.

This evidence is sufficient to support the trial court's findings, which in turn support its ultimate legal conclusion that Guzman's identification was not the result of an impermissibly suggestive procedure. Nothing in the trial court's findings or in the evidence suggests that the prosecutors encouraged Guzman to make a false identification. The meeting between prosecutors and Guzman appears to have been nothing more than an opportunity to go over what would happen in court. The prosecutors did not provide Guzman with any information that would not have been readily apparent to him during the proceedings. Thus, although prosecutors should avoid instructing the witness as to defendant's location in the courtroom, there is nonetheless insufficient evidence to support defendant's contention that prosecutors rigged Guzman's identification. Accordingly, although Guzman never explicitly testified that his meeting with prosecutors did not affect his in-court identification, the evidence in the record supports the trial court's conclusion that Guzman's identification was not a result of prosecutorial suggestion.

Nor do we agree with defendant's suggestion that the cumulative effect of viewing photographic arrays and meeting with prosecutors caused Guzman's in-court identification to be a violation of defendant's due process rights. The sequence of events leading to Guzman's in-court identification was not unnecessarily suggestive. When, as here, the first prong of the analysis "is answered in the negative, we need proceed no further." *Hannah*, 312 N.C. at 290, 322 S.E.2d at 151.

Assuming *arguendo* that the identification procedures used here were impermissibly suggestive, we nonetheless conclude, under the second prong of the analysis, that such procedures did not create a substantial likelihood of irreparable misidentification. *See Powell*, 321 N.C. at 369, 364 S.E.2d at 335; *Hannah*, 312 N.C. at 290, 322 S.E.2d at 151; *Headen*, 295 N.C. at 439, 245 S.E.2d at 708.

Finally, we note that Guzman's in-court identification was by no means the only evidence pointing to defendant's guilt. At trial, three witnesses testified that defendant admitted entering the Howard Johnson's to attempt a robbery and that he shot two people. One witness testified that defendant told him he had only gotten two or three hundred dollars from the robbery and that he was broke because he had paid for his friends to get into the Sugar Shack. Another person testified that defendant sold him a .44-caliber revolver on the evening of 1 January 1996, the day after the murders.

Accordingly, Guzman's in-court identification did not violate defendant's due process rights. Alternatively, assuming error *arguendo*, any due process violation was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (1999). This assignment of error fails.

**[4]** Defendant next argues that the trial court erred in excluding a potentially exculpatory statement defendant made to Edward Adams (Adams).

As indicated above, Adams and defendant spoke while in jail. Adams said the gun he had purchased from defendant had been destroyed. Defendant said, "I'm glad," and told Adams not to tell people about the gun. On cross-examination, defendant asked Adams if defendant had also said that defendant did not commit the crimes at issue.

The state objected to this question, and the trial court conducted *voir dire* outside the jury's presence. The trial court then considered

STATE v. FOWLER

[353 N.C. 599 (2001)]

the proposed testimony under North Carolina Rule of Evidence 403 and, by analogy, Rule of Evidence 106. The trial court concluded that defendant's self-serving statement of innocence was not necessary for an understanding of the testimony about the gun. Accordingly, the trial court sustained the state's objection to the proposed testimony.

First, defendant assigns error to the exclusion of the testimony as a violation of his right to freedom from cruel and unusual punishment. We note, however, that defendant advances no argument in his brief concerning cruel and unusual punishment. Accordingly, this argument is deemed abandoned. *See* N.C. R. App. P. 28(a), (b)(5).

Second, defendant argues that exclusion of his statement of innocence was a violation of his right to due process. It is widely accepted that if the state submits a defendant's confession, the defendant may then introduce other statements made by him if they involve a specific issue related to the inculpatory statements put forth by the state. *State v. Vick,* 341 N.C. 569, 578-79, 461 S.E.2d 655, 660 (1995); *see also State v. Lovin,* 339 N.C. 695, 709-10, 454 S.E.2d 229, 237 (1995); 2 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 212, at 67 (5th ed. 1998). However, statements may be admitted under this rule only if they were made during the same "verbal transaction" as the confession. *Vick,* 341 N.C. at 579, 461 S.E.2d at 660 (holding admission of earlier statements by defendant did not mean later statements by defendant in a different room were admissible); *State v. Jackson,* 340 N.C. 301, 319, 457 S.E.2d 862, 873 (1995) (holding a statement was inadmissible where it was made the same day but at a different time as a confession).

We further note that whether evidence should be excluded under Rule 403 or under the common law rule of completeness codified in Rule 106 is within the trial court's discretion. *State v. Thompson,* 332 N.C. 204, 219-20, 420 S.E.2d 395, 403 (1992); *State v. Mason,* 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986). An "[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis,* 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

Here, it is unclear whether defendant's statements about the gun and his assertion of innocence were part of the same verbal transaction. According to Adams, defendant stated that he did not commit the crimes at issue during the "same period of time that he was talk-

ing about the gun." In his testimony, however, Adams indicated that defendant's statement of innocence was made on a different day than at least some gun-related comments. While defendant stated his innocence on only one occasion, defendant and Adams apparently discussed the gun at numerous different times. Thus, we cannot conclude that the trial court abused its discretion in excluding defendant's alleged statements of innocence. Defendant's argument, therefore, must fail.

[5] Defendant next argues that the evidence introduced at trial was insufficient to prove beyond a reasonable doubt that he robbed Richmond with a dangerous weapon. Defendant claims this conviction violated his rights to due process and freedom from cruel and unusual punishment. Again, defendant advances no argument concerning cruel and unusual punishment in his brief. Accordingly, this argument is deemed abandoned. *See* N.C. R. App. P. 28(a), (b)(5).

Defendant was indicted for armed robbery of both the Howard Johnson's Motel and Richmond. The trial court denied defendant's motion to dismiss the charge of the Richmond count, and the jury found defendant guilty of both counts.

Defendant concedes that the evidence was sufficient to prove he stole the motel's money. Defendant argues, however, that the evidence is insufficient to show he stole money belonging to Richmond. Therefore, this Court must decide whether the trial court properly concluded that sufficient evidence existed to submit the Richmond count to the jury.

In ruling on a defendant's motion to dismiss, the trial court should consider if the state has presented substantial evidence on each element of the crime and substantial evidence that the defendant is the perpetrator. *State v. Israel*, 353 N.C. 211, 216, 539 S.E.2d 633, 636 (2000). The evidence should be viewed in the light most favorable to the state, with all conflicts resolved in the state's favor. *Id.* at 216, 539 S.E.2d at 637; *State v. Grooms*, 353 N.C. 50, 78, 540 S.E.2d 713, 731 (2000). The defendant's evidence should be considered only if it is favorable to the state. *Israel*, 353 N.C. at 216, 539 S.E.2d at 637; *Grooms*, 353 N.C. at 79, 540 S.E.2d at 731. If substantial evidence exists supporting defendant's guilt, the jury should be allowed to decide if the defendant is guilty beyond a reasonable doubt. *Grooms*, 353 N.C. at 79, 540 S.E.2d at 731.

In the instant case, the state's evidence showed that Richmond habitually carried cash in his wallet. Evidence of a habit can be used

to prove an element of a criminal offense. *See State v. Howell*, 335 N.C. 457, 473, 439 S.E.2d 116, 125 (1994). The state's evidence also showed that Richmond's wallet, business cards, and birth certificate were lying by his side at the scene of the crime. The wallet contained no money.

In *State v. Palmer*, 334 N.C. 104, 112, 431 S.E.2d 172, 176 (1993), this Court considered whether sufficient evidence of armed robbery existed. We held the jury's finding that money was taken at the time of the killing was supported by evidence that the victim always had money, that the victim's purse had been emptied, and that the purse contained no money. *Id.* at 112-13, 431 S.E.2d at 176.

Similarly, in *State v. Quick*, 329 N.C. 1, 8, 405 S.E.2d 179, 184 (1991), the victim's billfold was found on the floor next to his body. The billfold contained personal papers but no cash. *Id.* We held the conclusion that an armed robbery occurred during the killing was supported in part by evidence that the victim carried money on his person and that the victim's empty wallet was found at the scene. *Id.* at 20, 405 S.E.2d at 191.

Viewing the evidence in the light most favorable to the state, we hold the trial court in the present case properly denied defendant's motion to dismiss the Richmond count of robbery with a dangerous weapon. The evidence was sufficient to permit a reasonable jury to find defendant guilty of this charge beyond a reasonable doubt.

[6] Next, defendant assigns error to the trial court's instructions to the jury concerning the Richmond count of robbery with a dangerous weapon. Defendant contends the instructions allowed the jury to convict him of robbing Richmond even if it did not find that any of Richmond's personal property had been taken. Defendant thus claims violations of his rights to due process, freedom from double jeopardy, and freedom from cruel and unusual punishment. Defendant advances no argument in his brief concerning double jeopardy or cruel and unusual punishment, and these arguments are accordingly deemed abandoned. *See* N.C. R. App. P. 28(a), (b)(5). Because defendant failed to object at trial, defendant limits his attack on the instructions to plain error.

The relevant instructions provide:

> Now, the Defendant has been charged with robbery with a firearm on two counts, one of which being by taking property of UDP, Incorporated, doing business as Howard Johnsons; the

**STATE v. FOWLER**

[353 N.C. 599 (2001)]

other count being an allegation of taking property of Bobby Richmond with a firearm.

So then I charge that if you find from the evidence in this case, beyond a reasonable doubt, that on or about the alleged date, the Defendant had in his possession a firearm, and that he took and carried away property of UDP, Incorporated, which operated under the business name Howard Johnsons from the person or presence of a person without the voluntary consent of that person by endangering or threatening the life of that person with the use or threatened use of a firearm, the Defendant knowing he was not entitled to take the property, and intending to deprive that person of its use permanently, then it would be your duty to return a verdict of guilty of robbery with a firearm as to that particular charge.

However, if you do not so find, or have a reasonable doubt as to one or more of these things, it would be your duty to return a verdict of not guilty.

Now, so as to the [sic] distinguish between those two cases on the verdict sheet under the possible verdict guilty of robbery with a dangerous weapon, it says in parenthesis, of UDP, Incorporated, doing business as Howard Johnsons.

Your possible verdicts on that verdict sheet, and that is case number 96-CRS-2910, your possible verdicts are guilty of robbery with a dangerous weapon, or not guilty. You simply choose one of those verdicts according to your unanimous decision.

In the other case, I instruct you, likewise, that if you find from the evidence, beyond a reasonable doubt, that on or about the alleged date, the Defendant had in his possession a firearm, and that he took and carried away property from the person or presence of Bobby Richmond without his voluntary consent, by endangering or threatening his or another person's life with the use or threatened use of a firearm, the Defendant knowing at the time that he was not entitled to take the property, and intending to deprive that person of its use permanently, then it would be your duty to return a verdict of guilty of robbery with a dangerous weapon, or robbery with a firearm.

However, if you do not so find, or have a reasonable doubt as to one or more of these things, it would be your duty to return a verdict of not guilty.

And again, in case number 96-CRS-2909, your verdict sheets [sic] specifies guilty of robbery with a dangerous weapon of Bobby Richmond, or not guilty.

Defendant contends this instruction allowed the jury to find defendant guilty of robbing Richmond if the state proved defendant stole *any property* from Richmond's presence. According to defendant, this instruction impermissibly allowed the jury to find defendant guilty of both robberies based solely on the taking of the motel's money.

When analyzing jury instructions, we must read the trial court's charge as a whole. *State v. Hardy*, 353 N.C. 122, 131-32, 540 S.E.2d 334, 342 (2000). We construe the jury charge contextually and will not hold a portion of the charge prejudicial if the charge as a whole is correct. *Id.* at 132, 540 S.E.2d at 342. " 'If the charge presents the law fairly and clearly to the jury, the fact that some expressions, standing alone, might be considered erroneous will afford no ground for reversal.' " *State v. Rich*, 351 N.C. 386, 394, 527 S.E.2d 299, 303 (2000) (quoting *State v. Lee*, 277 N.C. 205, 214, 176 S.E.2d 765, 770 (1970)). Furthermore, to constitute plain error, the challenged instruction must result in a miscarriage of justice or the probability of a different verdict than the jury would otherwise have reached. *State v. Wallace*, 351 N.C. 481, 527, 528 S.E.2d 326, 355, *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 498 (2000).

In the present case, when the trial court's instructions are read as a whole, they adequately explain the different requirements for each robbery charge. In the first paragraph, the trial court explained that defendant was charged with two counts of robbery with a firearm, one charge for taking the motel's property, and one charge for taking Richmond's property. Moreover, in the specific instruction concerning Richmond's robbery, the trial court stated that defendant must have intended "to deprive *that person* of its use permanently." (Emphasis added). Thus, the trial court made clear that defendant had to take the motel's property to be guilty of the first robbery count and had to take Richmond's property to be guilty of the second robbery count.

When read in its entirety, the jury charge fairly presented the law to the jury. Because the trial court stated that property belonging to Richmond must have been taken for defendant to be guilty of robbing him, it is unlikely a different verdict would have been

reached had the instructions been more explicit or repetitive. Thus, the instructions did not amount to plain error. Defendant's argument is without merit.

## CAPITAL SENTENCING PROCEEDING

**[7]** Defendant assigns error to the trial court's submission of the (e)(4) aggravating circumstance during his capital sentencing proceeding. This circumstance exists when a murder is committed for the purpose of avoiding or preventing a lawful arrest or escaping from custody. *See* N.C.G.S. § 15A-2000(e)(4) (1999). Defendant argues that the evidence introduced at trial did not support submission of this aggravating circumstance and that its submission violated defendant's rights to due process and freedom from cruel and unusual punishment. Defendant advances no argument concerning cruel and unusual punishment in his brief. This argument is thus deemed abandoned. *See* N.C. R. App. P. 28(a), (b)(5).

To submit the (e)(4) aggravating circumstance, the trial court "must find substantial, competent evidence in the record from which the jury can infer that at least one of defendant's purposes for the killing was the desire to avoid subsequent detection and apprehension for a crime." *Hardy*, 353 N.C. at 135, 540 S.E.2d at 344. The trial court must analyze the evidence in the light most favorable to the state. *State v. Gregory*, 340 N.C. 365, 410-11, 459 S.E.2d 638, 664 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). The state should be granted every reasonable inference from the evidence, and all discrepancies and contradictions in the evidence should be resolved in the state's favor. *Id.* at 411, 459 S.E.2d at 664. If substantial evidence of the aggravating circumstance exists, the circumstance must be submitted to the jury. *Id.*

In *State v. Green*, the defendant shot a man who had been drinking heavily and was dozing off in a bar. 321 N.C. 594, 608-09, 365 S.E.2d 587, 595-96, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988). The victim was shot from behind while either asleep or paralyzed with fear. *Id.* at 609, 365 S.E.2d at 596. The evidence showed that the victim was defenseless and did not resist or struggle prior to his death. *Id.* The state argued that the fact that the victim was killed while in a defenseless position was sufficient indication he was killed to eliminate him as a witness. The court held this evidence was sufficient to justify submission of the (e)(4) aggravating circumstance. *Id.* at 608, 365 S.E.2d at 595.

Similarly, in the present case, no evidence exists to show that Richmond either posed a threat to defendant or tried to resist during the robbery. Defendant shot Richmond from behind from close range with a .44-caliber handgun. Richmond was on the ground at the time of the shooting. Such a shooting cannot be construed as merely facilitating the robbery. It is thus reasonable for the jury to infer from these facts that defendant shot Richmond to avoid being apprehended. Accordingly, defendant's assignment of error is without merit.

## PRESERVATION

Defendant raises five additional issues to permit this Court to reexamine its prior holdings and also to preserve these issues for any further judicial review: (1) the indictment's failure to allege all the elements of first degree capital murder; (2) the unconstitutionality of North Carolina's capital sentencing scheme; (3) the trial court's error in instructing the jury in the penalty phase that it had a duty to impose a death sentence if it found the mitigating circumstances failed to outweigh the aggravating circumstances and the aggravating circumstances were sufficiently substantial to call for the death penalty when considered with the mitigating circumstances; (4) the trial court's error in its definition of mitigating circumstances in the jury charge; and (5) the unconstitutionality of the Court's standards for proportionality review.

Defendant presents no compelling reason for this Court to depart from our prior holdings. Accordingly, these assignments of error are without merit.

## PROPORTIONALITY REVIEW

Having concluded defendant's trial and capital sentencing proceeding were free from error, we must review and determine (1) whether the record supports the jury's finding of any aggravating circumstances upon which the death sentence was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. The jury found all three aggravating circum-

stances submitted: (1) defendant committed the murder to avoid or prevent a lawful arrest, N.C.G.S. § 15A-2000(e)(4); (2) defendant committed the murder while engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); and (3) defendant committed the murder as part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person, N.C.G.S. § 15A-2000(e)(11).

Of the thirteen mitigating circumstances submitted, one or more jurors found four nonstatutory mitigators: (1) defendant was twenty years old at the time of the murder; (2) defendant had no stable father figure in his life; (3) defendant had an unstable home environment; and (4) defendant's mother abused alcohol.

After thoroughly examining the record, transcript, and briefs in this case, we conclude the evidence fully supports the aggravating circumstances found by the jury. Further, there is no evidence that defendant's death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor.

[8] Finally, we turn to our statutory duty of proportionality review. In conducting our proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *See State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). In conducting our review, we must " 'eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *State v. Atkins*, 349 N.C. 62, 114, 505 S.E.2d 97, 129 (1998) (quoting *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988)), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). This Court has found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

The present case is not substantially similar to any case where this Court found a death sentence disproportionate. Defendant in the

present case was convicted of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. "[A] finding of premeditation and deliberation indicates 'a more calculated and cold-blooded crime.'" *State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994) (quoting *State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994)), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). Moreover, the facts in this case indicate that defendant shot a helpless man, who was lying on the floor and who was in no way resisting defendant's robbery.

We have also compared the instant case with cases where we found the death penalty proportionate. *See McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we consider all the cases in the pool of similar cases during proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out the duty." *Id.*

There are four statutory aggravating circumstances which, standing alone, are sufficient to sustain a death sentence. *See State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). The jury found two of these circumstances, (e)(5) and (e)(11), in the present case. Thus, we conclude the present case is more similar to cases in which we have found a death sentence proportionate than to those where we found a death sentence disproportionate.

Whether a death sentence is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Based on the characteristics of this defendant and the crime he committed, we conclude the death sentence is not disproportionate.

Accordingly, defendant received a fair trial, free of prejudicial error.

NO ERROR.