BRYANT, Judge.
Steven Christopher Burke (defendant) appeals judgments filed 6 February 2003, entered consistent with jury verdicts finding him guilty of two counts of first-degree (felony) murder.
Defendant was indicted for two counts of first-degree murder and two counts of attempted robbery with a dangerous weapon. These matters came for hearing at the 9 January 2003 session of Mecklenburg County Superior Court with the Honorable Beverly L. Beal presiding. Defendant was found guilty as charged and was sentenced to two consecutive life sentences for the first-degree (felony) murder convictions. The trial court arrested judgment as to the two counts of attempted robbery with a dangerous weapon. Defendant gave notice of appeal in open court.
State's evidence
On 16 August 2000, the body of twenty-six year old Rhushaun Holley was discovered lying at the front door of 8713 Stoneface Road. Shortly thereafter, the body of twenty-four year old Rishod Lawrence Kelly was found lying on the kitchen floor at 8719 Stoneface Road. Both men had been shot to death.
In August 2000, Kendrick "Kenny" Nicholson and Kristen Lemmert were living together in a rented apartment. On the evening of 15 August 2000, Nicholson was at his cousin's house when he received a phone call from defendant. Defendant told Nicholson he knew of a "lick" (slang for a robbery) involving "weed, money and cocaine" and needed a ride because the brakes were not functioning properly on his cousin's (Robert "Snake" Johnson's) Cadillac. Defendant offered to split the money if he could get Lemmert to use her car - a red Nissan 240 SX - and drive to the location of the lick. He told Nicholson to meet Johnson at a local burger establishment.
Nicholson went to the burger establishment to meet Johnson. The two men got in Johnson's car and drove to Nicholson and Lemmert's apartment. Nicholson asked Lemmert to get dressed and follow them to the lick. He told her she would get a portion of the $7,000.00 to $10,000.00 if she would drive her Nissan. Lemmert agreed and followed Johnson and Nicholson to the Pop Shop at Woodlawn and Park Road. On the way there, Johnson showed Nicholson a handgun. The two cars left the Pop Shop and proceeded to 801 East Kingston Street to pick up defendant. Defendant came out of the house carrying a sawed-off shotgun wrapped in a hand towel. He talked to Johnson and Nicholson before walking to Lemmert's car and putting the shotgun in the back seat. Nicholson got in the car with Lemmert and defendant got in Johnson's car and the two cars headed to Johnson's apartment. All four got into Lemmert's car. Nicholson was wearing a white t-shirt with a Levi emblem on the front, dark blue Levi jeans, and black boots. Defendant was wearing a gray polo shirt and dark pants. Johnson had on a Hawaiian Tropic Shirt, white tank top, and dark pants.
The shotgun was still in Lemmert's car and Johnson and defendant were passing around a handgun in the back seat. Defendant and Johnson had said they were setting up a fake drug deal / robbery because they had no money to buy drugs.
Johnson made several cell phone calls. During one of these conversations, Nicholson heard Johnson say they were ready to come to the house, but when Johnson got off the phone, he said they were not ready and to ride around for a little while. Finally, Johnson told Lemmert to stop the car on a side street and the three men got out and talked at the back of the car. Johnson made another call before the three got back into the car. Nicholson heard Johnson say they were right up the street at the store. They had in fact been right around the corner from the house. Lemmert drove onto Stoneface Road and stopped in front of the house at 8719.
The three men got out of the car. Johnson instructed Lemmert to turn the car around so it would be facing the way they had comeand gave Nicholson the shotgun and told him to wait outside as a lookout. The three men went up the driveway. Nicholson stopped for a moment behind a Jeep in the driveway and defendant and Johnson ran around the back of the house. A few minutes later, Johnson came back out and told Nicholson to come in. Nicholson followed Johnson around to the back of the house and entered the kitchen still carrying the shotgun. There were two other men in the house - Kelly and Holley.
Either Kelly or Holley said something to Johnson about the shotgun Nicholson was carrying, so Johnson took the shotgun from Nicholson and placed it on the floor between the two chairs in which Johnson and Nicholson were sitting. They waited for fifteen or twenty minutes before one of the men told defendant, Johnson, and Nicholson that the man they were waiting for had not shown up and they were going to make a phone call. At that moment, defendant pulled a gun out of his pocket and announced, "[y]ou know what time it is."
Kelly tried to grab the gun defendant was holding and it fired. Kelly released the gun and started running toward Nicholson. Nicholson reached for the shotgun and defendant shot Kelly in the back. As the victim fell, defendant again shot Kelly. Meanwhile, Johnson and Holley were wrestling between the living room and the kitchen. Johnson yelled to Nicholson and defendant to shoot Holley. Defendant shot Holley and Holley started running. Defendant chased Holley toward the front of the house. Nicholson ran out the back door and around the house to Lemmert's car. Defendant met Nicholson at the neighbor's house. Defendant went back into the house to get Johnson. Defendant and Johnson returned to Lemmert's car. Defendant was carrying the gray t-shirt he had worn.
The three got back in the car and were all yelling and arguing that they had gotten nothing. Nicholson was arguing with Johnson about the return of $800.00 of front money he had given to Johnson to make it look like they were going to buy drugs. Lemmert was told to drive. The argument continued. Nicholson turned around facing the back seat and he and Johnson began pushing each other. Then Johnson hit Nicholson in the head with his gun. Nicholson turned back around in his seat, jumped out of the moving car, and ran to some houses nearby.
Defendant and Johnson told Lemmert to pull over and let them out or she was going to be next. Lemmert made the next left. Defendant and Johnson got out. The two men took the shotgun that was wrapped in the gray t-shirt.
Lemmert headed back to see if she could find Nicholson. Lemmert was pulled over by Officer Scott A. Evett and Sergeant G.H. Leveille of the Charlotte-Mecklenburg Police Department approximately a quarter mile later. She was removed from the car and arrested. Sergeant Leveille found a blood stained gray t-shirt laying on the roadway on the side street where Lemmert had parked. It tested positive for Holley's blood.
Nicholson was taken into custody as he walked down a road. He told the officers he had been robbed, hit in the head with a gunand he had jumped out of the car. Nicholson had abrasions and some lacerations to his head, arms, back, shoulders, and head.
Defendant's evidence
Defendant testified that he had gone with Johnson to sell some marijuana to Holley. Defendant told Nicholson and Lemmert he would smoke a "blunt" with them and give them $5.00 for gas if they would take him and Johnson to sell marijuana. They got beer and gas for the car, then proceeded to Holley's house at 8719 Stoneface Road.
Johnson made a call and let Holley know they were on their way. He told Lemmert to stop two houses before Holley's house so as not to draw attention to themselves because Holley's house was known for drug activity. The three men got out of the car and walked to Holley's house. Holley met them in the driveway and they all went to the back entrance of the house which opened into the kitchen. Johnson entered first. Defendant and Holley talked outside for a few minutes before following. Nicholson entered last. Kelly was waiting inside.
Defendant received a page and used the phone in the kitchen to call back. After he got off the phone, he asked Holley if he was "going to get the herb, or what?" Holley told defendant he did not smoke marijuana. Defendant turned to Johnson and asked him what was going on. Johnson and Holley began to argue and defendant left from the back door. He walked around to the front of the house and toward the location where Lemmert had parked, but she had moved. Lemmert's car was now facing in the direction in which they had come with the engine running. As defendant proceeded to walk tothe car, he heard three gun shots from the back yard of Holley's house. Defendant proceeded to Lemmert's car, and as he reached for the car, he saw Nicholson and Johnson coming from the side of the house. Nicholson was carrying a shotgun and Johnson was carrying a handgun. Defendant had not seen these weapons prior to this time. Defendant testified he did not own or carry a gun that evening and did not see a gun in the car.
The three got into Lemmert's car and sped away. Johnson and Nicholson were arguing. Johnson told Nicholson to shut up or he would shoot him too. Johnson put the gun to the back of Nicholson's head and Nicholson jumped out of the moving car.
The car proceeded another twenty-five yards before taking a left turn and pulling over. Johnson and defendant got out. Johnson threatened defendant and told defendant to grab the shotgun. Defendant saw a police car pass and then stop. Lemmert sped away in the car. Defendant threw the shotgun down near the curb and the marijuana in the bushes as he and Johnson started running through the woods. They called a cab from a nearby hotel and went to defendant's aunt's residence. Johnson called his girlfriend and she picked him up. Johnson did not tell defendant what had happened.
Defendant went to his mother's house about 8:00 a.m. that morning and told her what happened. At 11:00 a.m. that same morning, defendant went to the police to tell them what had happened. They told him they already knew he had nothing to do with the shooting and wanted him to say he saw Johnson shoot thetwo men. Defendant refused. They told him he could get the death penalty just for being at the crime scene. Defendant was scared, so he told the detectives he was not at Holley's house but was with Johnson and his girlfriend somewhere else. On 1 February 2001, defendant gave a police statement in the presence of his attorney.
At trial, defendant's girlfriend, Soukema Watson, testified that she and defendant had gone to her house after he got off work 15 August 2000. She recalled defendant getting a phone call and saying something about picking up some marijuana. Watson went to sleep between 11:00 p.m. and 11:30 p.m. Defendant was still awake. Between 1:30 a.m. and 2:00 a.m., Watson received a phone call from Nicholson, but defendant was not there at that time.
The issues on appeal are whether: (I) the trial court erred in failing to allow into evidence statements made by Charles Stephens; (II) the evidence was insufficient to sustain a conviction for first-degree murder (felony) based on having committed attempted robbery with a dangerous weapon; (III) the trial court erred when it disallowed testimony regarding the circumstances of statements defendant made during police interviews; and (IV) use of short-form first-degree murder indictments violated defendant's constitutional rights.
I
Defendant first argues that the trial court erred in failing to allow into evidence statements made by Charles Stephens pursuant to N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) and 803(24), therebydepriving defendant of his right to present a defense and right to due process.
"Admission of evidence is `addressed to the sound discretion of the trial court and may be disturbed on appeal only where an abuse of such discretion is clearly shown.' (citation omitted). Under an abuse of discretion standard, we defer to the trial court's discretion and will reverse its decision `only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision.'"(citation omitted). Gibbs v. Mayo, 162 N.C. App. 549, 561, 591 S.E.2d 905, 913 (2004).
N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) provides:
(b) Hearsay exceptions. - The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
. . .
(5) Other Exceptions. - A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.
N.C.G.S. § 8C-1, Rule 804(b)(5) (2003). N.C. Gen. Stat. § 8C-1, Rule 803(24) provides:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(24) Other Exceptions. - A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.
N.C.G.S. § 8C-1, Rule 803(24) (2003).
Defendant contends the trial court erred when it failed to allow into evidence statements made by Charles "Chuck" Stephens to defendant's investigator Aaron Stokes regarding statements made by Lemmert to Stephens. Because defendant was not able to serve a subpoena on Stephens, he sought to offer into evidence a tape recording and a transcript of the tape recording of statements Stephens made to Stokes during a telephone interview. Defendant contends that Lemmert's prior statements to Stephens were inconsistent with her trial testimony, but were corroborative of defendant's story at trial - that he was expecting to participate in a drug deal, not a robbery. At the voir dire hearing concerning admissibility of the tape recording and transcript, the State introduced evidence that on 27 January 2003, the day the State began to present evidence, defendant filed an incomplete notice of intent to offer Rule 804 hearsay evidence; and on 29 January 2003, defendant filed an addendum correcting the name of the unavailable witness from "Chuck Stevens" to "Chuck Stephens" and also adding the previously omitted street address for Stephens. At the voir dire hearing, defendant provided the unavailable witness's real name as "Charles Randall Stephens" and another address for him. Defendant attempted to serve a subpoena on Stephens beginning 12 January 2003, but after multiple attempts, was unsuccessful.
During the voir dire hearing, Stokes testified that he got a telephone number he thought belonged to Stephens. When Stokes called the number and asked the man who answered if he was Chuck Stephens, the man on the telephone never identified himself. Stokes admitted that he had never met Chuck Stephens face-to-face and had never talked with him before.
During the telephone interview, Stephens claimed to have spoken to Lemmert every day while she was in jail, but had no personal knowledge of the robbery and murders. In response to a question about Lemmert's drug activity, Stephens stated:
That's why she was hanging around with the wrong people. She had a small drug problem that she created with these people and just went along with the ride and all of a sudden she being held for murder. She didn't go in the house. She just drove, thinking it was a drug deal, and they came running out and got into the car and she still didn't know whatwas going on until after she got put in jail.
. . .
[S]he doesn't know what to say other than, you know, I'm not - we stopped to do, get some drugs. I drove them there because they wanted a ride. They went in, something happened. They came running out, jumped in the car and said, "Take off."
Stephens did indicate that Lemmert stated "they're trying to give her two years." However, it was his opinion this was a scare tactic. ("They're trying to get her to talk, but she don't know nothing to talk about, you know. She was in the car and when they were doing the drug deal she was outside. She didn't see nothing.") .
After the voir dire hearing, the trial court made findings of fact and concluded that defendant had not established the necessary criteria pursuant to State v. Triplett, 316 N.C. 1, 340 S.E.2d 736 (1986), to allow the tape recording and transcript into evidence. To admit hearsay testimony pursuant to Rule 804(b)(5), "the trial [court] first must find that the declarant is unavailable." Triplett, 316 N.C. at 8, 340 S.E.2d at 740. Once it is determined the declarant is unavailable, the trial court must proceed with a six-part inquiry: (1) Whether the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and its particulars; (2) that the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4); (3) that the statement possesses equivalent circumstantial guarantees of trustworthiness; (4) that the proffered statement is offered as evidence of a material fact; (5) whether the hearsay is more probative on thepoint for which it is offered than any other evidence which the proponent can produce through reasonable means; and (6) whether the general purpose of the rules of evidence and the interests of justice will be best served by admission of the statement into evidence. See Triplett, 316 N.C. at 9, 340 S.E.2d at 741.
The trial court found that Stephens was unavailable and diligent efforts had been made to find him. The trial court also found that the tape recording and transcript was "not covered by any other hearsay exception that would allow it into evidence." The trial court then found that the statement lacked guarantees of trustworthiness; that the declarant (Stephens) had almost no personal knowledge of the underlying events; he did not know anything about the other participants; and he did not speak to Lemmert face-to-face, only by telephone - therefore, he was not in a position to challenge or verify her veracity. Most importantly, Stephens was not under oath, and the trial court noted "his motivation to speak the truth is undermined by the circumstances of the telephone call with a person with whom he has no previous relationship and his desire to do something to help his friend, assuming it [was] Mr. Chuck Stephens."
The trial court questioned the trustworthiness of the recorded statement because the investigator could not state for certain that it was Stephens he talked to on the telephone. The trial court found the tape recording and transcript was limited in its usefulness as evidence of a material fact and not more probative than other allowable evidence. Finally, the trial court found thatas a result of its unreliability, "the probative value does not rise to a level that assures the court it is necessary to meet the ends of justice." The trial court also noted that the notice of intent to use the statement, under the circumstances of this case, was inadequate.
Defendant's primary argument is the statements by Stephens are admissible hearsay because they are prior inconsistent statements made by Lemmert. Defendant is incorrect. Stephens never indicated that any of his opinions about the circumstances of the crime were statements made by Lemmert; apparently, Stephens only told the investigator his opinion of Lemmert's side of the story. Although defendant could use Stephen's statement to attempt to impeach Lemmert, "'the making of the statements must be proved by direct evidence not by hearsay; and a witness may not be impeached by the inconsistent statements of someone else.'" State v. Ward, 338 N.C. 64, 98, 449 S.E.2d 709, 727 (1994) (citing 1 Kenneth S. Broun, Brandis and Broun on North Carolina Evidence § 159, at 523-28 (4th ed. 1993). "'Proof of a prior statement by a witness who heard it . . . second hand would clearly be inadmissible.'" Id. (citing Broun, at 528 n. 411).
To ascertain whether a hearsay statement has guarantees of trustworthiness, several factors should be considered: "(1) assurances of the declarant's personal knowledge of underlying events [and] (2) the declarant's motivation to speak the truth or otherwise." Triplett, 316 N.C. at 10-11, 340 S.E.2d at 742. These guarantees of trustworthiness are absent in this case. Here,Stephens did not have personal knowledge of the underlying events. The trial court properly concluded that the absence of any guarantees of trustworthiness in this case required that the tape recording and transcript be excluded.[1]
The trial court also found that defendant's notice of intent to offer the hearsay evidence was insufficient. Defendant only provided the declarant's proper name - as opposed to a nickname - and his address in an amended notice filed on 29 January 2003, the day before he attempted to admit the tape recording and transcript into evidence. Moreover, the notice did not provide the text of the tape recording or transcript and only a summary of what Lemmert allegedly told Stephens.
The purpose of the notice requirement is to offer "a fair opportunity" for the opposing party to address the proffered evidence. Triplett, 316 N.C. at 12, 340 S.E.2d at 743. Although the trial court did not rely solely on this basis to exclude the evidence, its additional finding of insufficient notice was a proper exercise of discretion.
Finally, defendant argues that as a matter of constitutional due process, "[w]here the rules of evidence and constitutional provisions conflict, the former must give way to the latter." Specifically, defendant urges that in the interest of fairness and justice, he should be allowed to admit evidence of prior inconsistent statements Lemmert made to Stephens via admission intoevidence of Stephens' tape recording and transcript. Under the facts of this case, however, Lemmert was available to testify and was cross-examined at length, thereby allowing defendant to fully exercise his right to confront Lemmert and impeach her trial testimony. See, e.g., State v. Fowler, 353 N.C. 599, 614-16, 548 S.E.2d 684, 696-97 (2001).
In addition, defendant's convictions for robbery did not rest solely on Lemmert's testimony about the planned robbery; Nicholson also testified about the robbery plan. The trial court properly considered all relevant factors for admitting hearsay in accordance with Triplett and did not err by finding the tape recording and transcript of Stephens' conversation with defendant's investigator inadmissible. This assignment of error is overruled.
II
Defendant next argues that the evidence was insufficient to prove he committed attempted armed robbery, thereby his convictions for first-degree (felony) murder must be vacated.
In a ruling on a motion to dismiss, the trial court must determine whether there is substantial evidence of each element of the offense charged. See State v. Bullard, 312 N.C. 129, 160, 322 S.E.2d 370, 387 (1984). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Smith, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). When reviewing the evidence, the trial court must consider all evidence in the light most favorable to the prosecution, granting the State the benefit of every reasonableinference. See State v. Brown, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984). "If the trial court determines that a reasonable inference of the defendant's guilt may be drawn from the evidence, it must deny the defendant's motion and send the case to the jury even though the evidence may also support reasonable inferences of the defendant's innocence." State v. Smith, 40 N.C. App. 72, 79, 252 S.E.2d 535, 540 (1979).
In North Carolina, the elements of robbery with a dangerous weapon are:
(a) Any person or persons who, having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, whereby the life of a person is endangered or threatened, unlawfully takes or attempts to take personal property from another or from any place of business, residence or banking institution or any other place where there is a person or persons in attendance, at any time, either day or night.
N.C.G.S. § 14-87(a) (2003).
The two elements necessary to establish an attempt to commit a crime are: "`first, the intent to commit the substantive offense; and, second an overt act done for that purpose which goes beyond mere preparation, but falls short of the competed offense.'" State v. Robinson, 355 N.C. 320, 338, 561 S.E.2d 245, 257 (2002) (citation omitted). As a result,
[a]n attempted robbery with a dangerous weapon occurs when a person, with the specific intent to unlawfully deprive another of personal property by endangering or threatening his life with a dangerous weapon, does some overt act calculated to bring about this result.
State v. Allison, 319 N.C. 92, 96, 352 S.E.2d 420, 423 (1987). The evidence presented in the instant case showed that defendant and his co-conspirators planned to rob the victims of "weed, money and cocaine." Nicholson testified that defendant told him and Johnson that "he knew a lick" they could make. A lick, in street terms, means a robbery. Nicholson told his girlfriend, Lemmert, the group "had a lick and we needed to use her car;" he also told her "there would be a split if she drove the car." Lemmert testified that Nicholson told her "he needed to do a lick." She also testified that a lick "means to rob somebody. He needed some money and he needed to go rob somebody." Lemmert indicated she was told this lick involved "money and drugs" and that she was told she would get a portion of the $7,000.00 to $10,000.00 proceeds expected from the robbery.
In planning the robbery, defendant and his co-conspirators took Johnson's gun and defendant's sawed-off shotgun with them to the victims' house. Nicholson and Lemmert testified that defendant was picked up as part of the plan and they drove around for a while making their plans for the robbery. Nicholson testified that Johnson called the victims' house and indicated that they were at the store, when in fact, they were right around the corner from the house. Lemmert testified that Johnson and defendant told her about the robbery plan, which included setting up a fake drug deal. When they reached the victims' house, defendant and Johnson went into the house with the handgun, while Nicholson stood watch outside with the shotgun. Nicholson later went into the house with the shotgun. Inside the house, defendant waited around several minutesfor a drug connection they were allegedly expecting to arrive. When the alleged drug connection did not show up, defendant pulled the gun out of his pocket and said, "[y]ou know what time it is." Both victims were shot and killed.
The record established plenary evidence of defendant's intent to rob the victims and overt acts taken in furtherance of that goal. Despite defendant's assertion - of a fatal variance between the indictment and the evidence presented at trial - there was sufficient evidence that the robbery was to include the taking of both money and drugs.[2] This assignment of error is overruled.
III
Defendant next argues the trial court erred "when it did not allow defendant to let the jury know the full circumstances of his interview with the police." The essence of this argument is defendant's contention that "the jury had a right to know that defendant did not tailor his statement to neatly dovetail" with the prosecution's main witnesses, Lemmert and Nicholson.
"The United States Supreme Court has stated that `the circumstances surrounding the taking of a confession can be highly relevant to two separate inquiries, one legal and one factual.'" State v. Leeper, 356 N.C. 55, 60, 565 S.E.2d 1, 4 (2002) (quoting Crane v. Kentucky, 476 U.S. 683, 688, 90 L. Ed. 2d 636 (1986)). For this reason, "the factual issue of credibility for a jury's consideration stands apart from the issue of voluntariness that isdecided as a question of law by a trial judge." Leeper, 356 N.C. at 60, 565 S.E.2d at 4. "Evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility." Crane, 476 U.S. at 691. Thus, defendant is correct in arguing that he should be given full opportunity to address the circumstances surrounding statements he made during a police interview.
In the instant case, defendant testified at length about two statements he made to the police. Originally, defendant voluntarily appeared at the law enforcement center. According to defendant, he did not tell the truth during this interview because the two detectives who interviewed him told him that just by being at the scene of the crime he could receive a lethal injection. Defendant, however, was allowed to testify to statements such as these allegedly made by the officers for the purpose of explaining his subsequent conduct.
Defendant also testified that he agreed to a second police interview with his attorney present. In testifying about this later statement - in which he changed his account of the incident - defendant testified that when he made this statement he had not received discovery from the State and had not seen the statements from any of the other participants in the attempted armed robbery and murders. While explaining that he had not received discovery prior to making his statement, defense counsel asked defendant the question that is the subject of this assignment of error and which was objected to by the State and sustained by the trial court:
Q. And when you made that statement on February the 1st of 2001, at that point in time had you received any discovery in the case?
A. No, I had not.
Q. In fact, was that one of the conditions of that interview taking place?
[STATE]: Objection.
COURT: The objection is sustained.
Q. And did you . . . - at some time later in that interview, did you receive discovery?
A. Yes. I received my discovery maybe a month and a half, maybe two, maybe further, after I made my initial statement.
Q. And by "discovery" what do you mean?
A. I received everybody else's statement that is involved in this case along with the police notes and all of that other stuff.
Q. And had you see[n] any of that before you gave the February 1st, 2001, statement?
A. No. I didn't see any of that.
We conclude that defendant was not prejudiced by the trial court sustaining the State's objection to defense counsel's question concerning the conditions surrounding the second interview because defendant was allowed to introduce plenary evidence concerning the circumstances surrounding both interviews and corresponding statements. This assignment of error is overruled.
IV
Defendant last argues that the short-form first-degree murder indictments were constitutionally defective in that the indictments did not allege "the elements of premeditation, deliberation or thepresence of the specific intent to kill nor that the offense was committed during the perpetration of a felony."
Defendant raises these arguments to preserve them for possible future proceedings, but acknowledges that the North Carolina Supreme Court has previously rejected defendant's contention. See State v. Braxton, 352 N.C. 158, 174, 531 S.E.2d 428, 437 (2000) (approving short-form first-degree murder indictment); State v. Clark, 325 N.C. 677, 684, 386 S.E.2d 191, 195 (1989) (holding that the State is not required to make an election regarding first-degree murder theory); see also State v. Anderson, 355 N.C. 136, 558 S.E.2d 87 (2002); State v. Long, 354 N.C. 534, 557 S.E.2d 89 (2001); State v. Wilson, 354 N.C. 493, 556 S.E.2d 272 (2001); State v. King, 353 N.C. 457, 546 S.E.2d 575 (2001), cert. denied, 534 U.S. 1147, 151 L. Ed. 2d 1002, 122 S. Ct. 1107 (2002); State v. Call, 353 N.C. 400, 545 S.E.2d 190 (2001). Accordingly, we summarily overrule this assignment of error.
No error.
Judges HUDSON and TYSON concur.
Report per Rule 30(e).

We note, the Rule 804(b)(5) analysis utilized in Section I of this opinion equally applies to admissibility of the contested hearsay statements pursuant to Rule 803(24).

We note, the trial court arrested judgment regarding the two armed robbery convictions.