## STATE v. CHARLES WELLBORN.

(Filed 15 December, 1948.)

**1. Conspiracy § 6—**

The evidence tended to show that a gun fight between defendant and his companion on the one hand and a third person on the other was precipitated by defendant's companion, that defendant's companion had made repeated threats to kill such third person, and that defendant and his companion were seen together several times shortly before the affray. There was no evidence that defendant had any knowledge of the threats or of his companion's intent prior to the actual encounter. *Held:* The evidence is insufficient to resist defendant's motion to nonsuit the charge of conspiracy to commit a felonious assault.

**2. Criminal Law § 34g: Assault § 12—**

Where, in a prosecution for felonious assault, there is no sufficient evidence of a conspiracy between defendant and his companion, testimony of prior threats to kill such third person made by defendant's companion and evidence as to ill feeling between those two, is incompetent, and the admission of such evidence entitles defendant to a new trial on the charge.

DEFENDANT's appeal from *Sink, J.,* August Term, 1948, CHEROKEE Superior Court.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*T. M. Jenkins for defendant, appellant.*

SEAWELL, J.   The defendant Wellborn was charged in a bill of indictment containing two counts (a) with conspiring with one Guy Cain, now deceased, to feloniously assault, beat and wound one Hubert Wells with a deadly weapon and inflict on him serious injury and (b), (again with the deceased Cain joined in the indictment), with felonious assault on the said Wells, and beating and wounding him with a deadly weapon, to wit: a pistol, with intent to kill, and inflicting upon him serious injury not resulting in death.

On the defendant's plea of not guilty the trial proceeded.

The evidence discloses that the defendant Wellborn and Guy Cain had been seen together at various times on the night of the gun fight in which Wells was wounded and Guy Cain killed, and Wellborn himself seriously wounded; and that about 12 o'clock at night he and Guy Cain in a pickup truck started out from a public parking place near the police station and directly behind a car occupied by Wells and two girl friends as it passed them, and followed it for about a block when Cain demanded that the Wells car pull over. When Wells stopped the car both Cain and Wellborn got out of the truck and Cain approached Wells' car. As he approached

Wells got out of his car with his gun in hand and warned Cain to come no further. One of the girls in the car testifying for the State said that Wells shot first, and immediately about six shots followed in rapid succession. At the end of the shooting Wells was lying upon the ground seriously wounded, Cain was standing near with two pistols in his hands, and Wellborn was leaning against the pickup truck seriously wounded and apparently in poor condition. Wells survived his wounds and was released from the hospital in about two weeks but some months later was killed in an airplane wreck. Cain died of his wounds; Wellborn alone survives.

The evidence relied on by the State to support the charge of conspiracy is confined to the circumstance of Wellborn being seen with Cain a few times that night and that he accompanied Cain in the pickup truck when following the Wells car to the place of the fight. The evidence discussed *infra* leads to the conclusion that in proving the conspiracy the State relied upon the contacts between Wellborn and Cain during the incubation period in which Cain was nursing his anger and planning the killing of Wells, and the incidents noted below.

But there is no evidence that Cain had ever communicated to Wellborn his purpose or that prior to the actual fatal encounter Wellborn had any knowledge of the intent. Whether the circumstances surrounding the immediate occurrence amounted to evidence of a concert of action is another matter. In this situation the State undertook to prove the guilt of defendant of the conspiracy by introducing evidence of the declarations of Guy Cain and his demonstrations of anger and threats, apparently on the theory that they were the declarations and conduct of a co-conspirator made and done in the furtherance of the conspiracy. The character and significance of this evidence and its irrelevance to the charge against the defendant is illustrated by the following excerpts:

Neil Hughes had testified that on the night Wells was shot he was working at the Murphy Cafe on the opposite side of the street from Hubert Wells' place of business. He saw Guy Cain and Hubert Wells in the cafe at 9:30 or 10 o'clock that night. Harold Wells and Hubert Wells were sitting in a booth drinking coffee when Guy Cain came in. Witness stated that Cain said something to him. At this point the following occurred:

"Q. Now, going back to Mr. Cain, you say he called you over to the booth; what, if anything, did Mr. Cain say about Hubert Wells?"

Defendant objected; overruled, and exception.

"Q. Go ahead. What did Mr. Cain tell you?"

Objection, overruled. Exception.

"A. He asked me if I saw Hubert Wells, and I said he was sitting up there with Harold and he said, 'I am going to kill that S. O. B.' and I

said, 'You don't mean it, you are just joking;' and he got a plate of food and went out the front door and I didn't see him any more."

By the court: "To all the foregoing the defendant in apt time excepts and moves to strike. Motion overruled and defendant excepts."

"I saw Mr. Cain have a conversation with Miss Davis where you just enter into the kitchen from out of the cafe. He had some food on a plate in his hand."

"Q. Did you observe Mr. Cain's demeanor, whether he appeared to be normal? Describe his appearance."

Defendant objects. Overruled. Exception.

"A. If ever I saw anybody mad he was mad. He had hold of her arm and had a plate of food in his hand and went out the back door."

Defendant objected. Overruled and exception.

"Q. Did you that night, or shortly after that, communicate to Hubert Wells what Mr. Cain said he was going to do?"

Objection by defendant.

By the court: "Now Wells is dead."

By Mr. Grey: "I'm not asking what Wells said."

By the court: Objection. Overruled and exception. Over objection and exception of defendant the witness was permitted to testify as follows:

"I closed at 12:00 and didn't know when Miss Davis left or how she left the cafe. She left just a little before we checked up. I went out the front door when I closed and that is when I saw Mr. Cain with Mr. Wells. Clara Daughtery was working there that night. I do not know if anyone left with Myrtle Davis or whether they left together. When I came out of the cafe I said to Cain, 'Let's go home.' Mr. Wellborn didn't say anything. They were just sitting there."

Harold Wells testified that he was in the cafe on the night of the shooting. Over objection and exception of the defendant he was permitted to say that he told Hubert Wells what Cain had said, repeating it: "You see that S. O. B. coming in the door? I am going to kill him tonight."

Myrtle Davis testified for the State that on the night of the shooting she was working at the cafe and had been working there for about two or three years; that she was "keeping company" with Hubert Wells. She knew Charles Wellborn and had known Cain for about a year. Was with Wells when he got shot. On that night she saw Cain in the cafe.

Over objection and exception by the defendant she was permitted to testify that Cain said to her, "If you go with that S. O. B. tonight I will kill him before the night is over," and that she told Wells about it. And further, that Cain said he would be waiting.

The witness stated that later she was in the car with Wells and Miss Daughtery, and driving back down town. Wellborn and Cain were parked near the drug store. "We started to pull in and they pulled in

behind us. We went on down the street to the Henry House and Cain said for him to pull over, and he pulled over to the sidewalk."

The witness testified that Cain got out of the truck and came toward the Wells car. Wells got out of the car with his gun in hand, telling Cain not to come any nearer, that he didn't want to have any trouble. "Cain came over to the door and one shot was fired. That was when I thought he shot Cain. Wellborn and Cain came out of the truck on the same side."

Clara Daughtery, witness for the State, was permitted to testify over the objection and exception of the defendant about what Guy Cain told her in regard to killing Wells. The testimony is of the same character as that of the witness Davis and the exceptions are numerous. Repetition is unnecessary.

At the conclusion of the State's evidence the defendant demurred to the evidence as to each count in the indictment and as to the indictment as a whole, and made a motion for judgment as of nonsuit. The motions were declined and exceptions noted.

The defendant testified that he knew nothing of any ill feeling between Cain and Wells. That on the night in question he had umpired or refereed second base at a baseball game, getting away from the game late in the night. That when he reached town he ran up with Guy Cain who asked him to carry him back to the park so that he might get his own car which he had left there, and he did so. They drove back into town and he and Guy Cain were sitting in the same car at a public parking place when a car containing Wells and the girls passed and Cain said that he wanted to speak to Wells, and not knowing that anything was wrong between them he drove the car in the direction in which the Wells car was going until Cain demanded that the latter car turn in; and that when Cain got out of the car he tried to hold him back but could not do so and was pulled out of the car with him. That he was shot as Cain approached the Wells car and knew little more about it because of the seriousness of his wounds; knew little else about what had happened. He denied participating in the fight at all.

The State, however, in rebuttal, put on Harold Wells, a cousin of Hubert Wells, who stated that shortly after the occurrence he visited Wellborn in the hospital and asked him why he had shot Hubert. The reply as testified by the witness was that Hubert shot Cain and he was trying to protect his buddy, shot him to prevent him from killing Cain "or something like that."

At the end of all the evidence the defendant demurred again to the evidence, as to each count, and moved for judgment of nonsuit. The motions were denied and defendant excepted.

The case was submitted to the jury who returned a verdict of guilty on both counts. The defendant moved to set the verdict aside for errors of law, which motion was refused, and he excepted. To the ensuing judgment on the verdict, he excepted and appealed.

Clearly the evidence was legally insufficient to support the verdict of guilty on the first count charging conspiracy, and the demurrer thereto should have been sustained.

On the second count the admission of evidence of Cain's declarations and demeanor not in the presence of the defendant constitutes reversible error, entitling him to a new trial thereon, and it is so ordered.

On the first count, Reversed.

On the second count, New trial.