An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-553

NORTH CAROLINA COURT OF APPEALS

Filed:  18 March 2014

STATE OF NORTH CAROLINA

v.

Union County
Nos. 10 CRS 56325-26, 11 CRS 2520-21, 12 CRS 2040

OTIS REDDING HOWIE, JR.


Appeal by defendant from judgments entered 18 October 2012 by Judge Anna Mills Wagoner in Union County Superior Court. Heard in the Court of Appeals 24 October 2013.

> *Attorney General Roy Cooper, by Special Deputy Attorney General David N. Kirkman, for the State.*

> *Appellate Defender Staples Hughes, by Assistant Appellate Defender Kathleen M. Joyce, for Defendant.*

ERVIN, Judge.

Defendant Otis Redding Howie, Jr., appeals from judgments sentencing him to two terms of 260 to 321 months imprisonment based upon his convictions for two counts of attempted murder while having the status of an habitual felon, to two terms of 115 to 147 months imprisonment based upon his convictions for two counts of robbery with a dangerous weapon while having the status of an habitual felon, to a term of 115 to 147 months imprisonment based upon his conviction of possession of a

firearm by a convicted felon while having the status of an habitual felon, all to be served consecutively, and to a concurrent term of 100 to 129 months based upon his conviction for conspiracy to commit robbery with a dangerous weapon while having the status of an habitual felon. On appeal, Defendant contends that the trial court erred by denying his motion to suppress evidence concerning in-court and out-of-court identifications of him as the perpetrator of the offenses at issue in this case, failing to correctly instruct the jury concerning the manner in which they should evaluate the eyewitness identification evidence, and denying his motion to dismiss the conspiracy charge for insufficiency of the evidence. After careful consideration of Defendant's challenges to the trial court's judgments in light of the record and the applicable law, we conclude that the trial court's judgment in the conspiracy case should be vacated and that the trial court's other judgments should remain undisturbed.

## I. Factual Background

### A. Substantive Facts

At the time of trial, Robbie and Crystal Jordan had been married for ten years. Since 1995, Ms. Jordan had worked for a license tag agency in Monroe. In 2003, the Jordans purchased

the agency, which they operated pursuant to contract with the Division of Motor Vehicles.

In the course of operating the agency, the Jordans made a practice of taking the proceeds received each day to First Citizens, which was the bank at which the agency's account was maintained, for deposit. More specifically, after Mr. Jordan counted the day's receipts, the relevant cash and checks would be placed in a locked First Citizens moneybag that was, in turn, placed inside a black Harley Davidson bag that Ms. Jordan used to take the day's proceeds to the bank.

On 1 November 2010, Mr. Jordan counted the day's receipts, which totaled $33,000 in cash and checks, as usual and handed them to Ms. Jordan, who put them in the First Citizens and Harley Davidson bags. In addition, Ms. Jordan had another bag that contained nearly $800 for use on the following day. At that point, Mr. Jordan cut off the lights while Ms. Jordan looked outside to make sure that there were no suspicious people in the vicinity of the building in which the agency was housed.

As the Jordans left the building and approached their vehicles, Mr. Jordan noticed someone standing near the wall of an adjoining building and watched as he began to move toward them, reached into the front of his pants, and pulled out a firearm. Although Mr. Jordan asked the individual with the

firearm to refrain from shooting him, the person in question asked Ms. Jordan to give him the bag containing the days' proceeds; shot her once immediately after making this demand, causing her to fall to the ground; and then shot Ms. Jordan again as she lay on the ground. Ms. Jordan sustained two gunshot wounds to the chest, one to her hand, and at least one to her ear, injuring her so severely that one of her lungs had to be removed and creating the possibility that she may never walk again. As Mr. Jordan struggled with the man who assaulted Ms. Jordan, the assailant, who appeared to be missing some front teeth, shot Mr. Jordan in his knee, foot, shoulder, and face. After taking the proceeds from the licensing agency, $1,200 that Mr. Jordan had on his person, and $600 and a .38 caliber pistol that Ms. Jordan had in her pocketbook, the assailant ran away, turning back and looking at Mr. Jordan before continuing to run up a hill.

Billy Montgomery and Eric Cruz worked for an automobile detailing establishment located across the street from the Jordans' business. Mr. Montgomery observed the person who shot the Jordans pacing around the agency's parking lot for approximately twenty minutes prior to the robberies and shootings. After robbing and shooting the Jordans, the assailant, who was an African American male wearing what Mr.

Cruz identified as Jabo jeans, ran toward a hospice office located behind the Jordans' business. A few minutes later, a gray or silver Dodge Charger, apparently driven by a light-skinned African-American female, appeared from the direction toward which the assailant had run and drove off toward Charlotte.

Defendant had a good friend named Melvin Luckey, who lived with his girlfriend, Tanika Ingram, in October and November 2010. In October 2010, Defendant began keeping clothes at Ms. Ingram's residence because his girlfriend had ejected him from the residence that they had shared. Although Defendant was unemployed, he drove a gray Dodge Charger rental car. At some point prior to his arrest, Defendant told Ms. Ingram that he had shot someone in order to get money. In addition, Ms. Ingram indicated that Defendant owned a long revolver. Ms. Ingram also observed that Defendant and Mr. Luckey appeared to have a lot of money after 1 November 2010, having reached this conclusion because the two men had purchased new clothes, and were jittery in the days prior to their arrest.

According to information developed during the investigation into the robberies and shootings, Defendant and Mr. Luckey had purchased various items, including clothing, at Sports Trax in Charlotte at 7:41 p.m. on 1 November 2010, approximately two

hours after the robberies and shootings. In addition, investigating officers determined that Defendant had made deposits totaling $4,160 into his accounts on 2 November 2010. During a search of the residence of Brittany Fulwiley, who is the mother of Defendant's children, investigating officers discovered jeans on which Ms. Jordan's blood was subsequently detected. In addition, investigating officers conducting the search of Mr. Luckey's residence found Ms. Jordan's purse, the Harley Davidson moneybag, and a .44 caliber pistol from which the projectiles recovered following the robberies and shootings could have been fired.

## B. Procedural Facts

On 9 November 2010, warrants for arrest charging Defendant with two counts of attempted murder, two counts of robbery with a dangerous weapon, larceny of a firearm, and possession of a firearm by a felon were issued. On 5 July 2011, the Union County grand jury returned bills of indictment charging Defendant with two counts of attempted murder, two counts of robbery with a dangerous weapon, two counts of conspiracy to commit robbery with a dangerous weapon, one count of possession of a firearm by a felon, and one count of larceny of a firearm. On 24 August 2012, the State filed a notice that it intended to prove that Defendant "induced others to participate in the

commission of the offense"; that Defendant "occupied a position of leadership or dominance of other participants in the commission of the offense"; that the offense was committed "for the purpose" of "avoiding or preventing a lawful arrest" and "effecting an escape from custody"; that "[t]he offense was especially heinous, atrocious or cruel"; that Defendant "knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person"; that Defendant "was armed with a deadly weapon at the time of the crime" and "used a deadly weapon at the time of the crime"; that Defendant "committed the offense while on pretrial release on another charge"; that Defendant "has, during the 10-year period prior to the commission of the offense for which [he] is being sentenced, been found by a court of this State to be in willful violation of the conditions of probation imposed pursuant to a suspended sentence or been found by the Post-Release Supervision and Parole Commission to be in willful violation of a condition of parole or post-release supervision imposed pursuant to release from incarceration"; that "[t]he offense involved" "an attempted taking of property of great monetary value" and "the actual taking of property of great monetary value"; that Defendant "does not support [his] family"; and that "[t]he victim of this

offense suffered serious injury that is permanent and debilitating." On 4 September 2012, the Union County grand jury returned a bill of indictment charging Defendant with having attained the status of an habitual felon.

On 1 October 2012, Defendant filed a motion seeking to have evidence of any out-of-court and in-court identification of Defendant made by Mr. Jordan suppressed on the grounds that the evidence in question had been obtained in violation of N.C. Gen. Stat. § 15A-284.52. After a hearing held on 8 October 2012, the trial court entered an order denying Defendant's suppression motion on 27 March 2013.

The charges against Defendant came on for trial before the trial court and a jury at the 8 October 2012 criminal session of the Union County Superior Court. On 18 October 2012, the jury returned verdicts convicting Defendant as charged. After the jury returned these verdicts, Defendant pled guilty to having attained the status of an habitual felon and admitted the existence of the aggravating factors that "[t]he offense was especially heinous, atrocious or cruel"; that he had "knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person"; that he "used a deadly weapon at the time of the crime;" and that "[t]he victim of this offense

suffered serious injury that is permanent and debilitating." After accepting Defendant's admissions, the trial court found the existence of the aggravating factors to which Defendant had admitted,[1] found as a mitigating factor that Defendant "has a support system in the community," and that the findings in aggravation outweighed the findings in mitigation. Based upon the jury's verdicts, Defendant's guilty plea, and its findings in aggravation and mitigation, the trial court entered judgments sentencing Defendant to a term of 260 to 321 months imprisonment for the attempted murder of Ms. Jordan, to a consecutive term of 115 to 147 months imprisonment for the robbery of Ms. Jordan with a dangerous weapon, to a consecutive term of 260 to 321 months imprisonment for the attempted murder of Mr. Jordan, to a consecutive term of 115 to 147 months imprisonment for the robbery of Mr. Jordan with a dangerous weapon, to a consecutive term of 115 to 147 months imprisonment for possession of a firearm by a felon, and to a concurrent term of 100 to 129 months imprisonment for conspiracy to commit robbery with a dangerous weapon. On the other hand, the trial court arrested

---

[1]As we read the findings in aggravation and mitigation made in each case, the trial court did not find that Defendant "was armed with a deadly weapon at the time of the crime" or that "the offense" involved "an attempted taking of property of great monetary value" or "the actual taking of property of great monetary value," since the trial court did not check the relevant blocks on Form AOC-CR-614.

judgment with respect to Defendant's conviction for larceny of a firearm and one count of conspiracy to commit robbery with a dangerous weapon. Defendant noted an appeal to this Court from the trial court's judgments.

## II. Legal Analysis

### A. Conspiracy Judgment

In his first challenge to the trial court's judgments, Defendant contends that the trial court erred by denying his motion to dismiss the conspiracy to commit robbery with a dangerous weapon charge that had been lodged against him based upon the insufficiency of the evidence. More specifically, Defendant contends that the record is devoid of any evidence tending to show that he and Mr. Luckey conspired to rob the Jordans other than that tending to show that the two of them committed the relevant criminal acts together and that such evidence is not sufficient to sustain a conspiracy conviction. As the State candidly concedes, Defendant's contention has merit.

According to well-established North Carolina law, a defendant's dismissal motion should be denied in the event that "there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense."

*State v. Scott*, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002) (quoting *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980)).  In making this determination, the record evidence must be considered in the light most favorable to the State.  *State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 652 (1982).  "We review the trial court's denial of a motion to dismiss *de novo*," "consider[ing] the matter anew and freely substitut[ing our] own judgment for that of the trial court."  *State v. Sanders*, 208 N.C. App. 142, 144, 701 S.E.2d 380, 382 (2010) (citing *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) and *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008)).

"A criminal conspiracy is an agreement between two or more persons to do an unlawful act or do a lawful act in an unlawful way or by unlawful means."  *State v. Massey*, 76 N.C. App. 660, 661-62, 334 S.E.2d 71, 72 (1985).  A conspiracy conviction does not require proof that the defendant committed any particular overt act; instead, proof of an agreement between two or more persons to commit a crime, without more, is sufficient to support a conspiracy conviction.  *State v. Brewer*, 258 N.C. 533, 538, 129 S.E.2d 262, 266 (1963) (citing *State v. Knotts*, 168 N.C. 173, 188, 83 S.E. 972, 979 (1914), and *State v. Davenport*, 227 N.C. 475, 494, 42 S.E.2d 686, 699 (1947)).  "[T]he beginning of a conspiracy to commit a crime must[, however,] precede the

commission of the crime itself," *State v. Locklear*, 8 N.C. App. 535, 537, 174 S.E.2d 641, 642 (1970), with proof that the crime that was the alleged object of the conspiracy was actually committed not being sufficient to support a conspiracy conviction. *State v. Arnold*, 329 N.C. 128, 142, 404 S.E.2d 822, 831 (1991).

According to the record, Mr. Luckey and Defendant were friends and lived together at the time that the Jordans were shot and robbed. In addition, the record shows that Mr. Luckey possessed both the firearm used in the robbery and proceeds from the robbery after 1 November 2010. However, even when taken in the light most favorable to the State, the record contains no evidence tending to show that the commission of the crimes at issue here stemmed from an agreement between Defendant and Mr. Luckey to engage in criminal conduct, a fact that makes this case similar to decisions such as *State v. Wellborn*, 229 N.C. 617, 618, 50 S.E.2d 720, 721 (1948) (holding that the defendant's conspiracy conviction should be overturned given that "there is no evidence that [the alleged co-conspirator] had ever communicated to [the defendant] his purpose or that prior to the actual fatal encounter [the defendant] had any knowledge of the intent"). For example, the record contains no evidence tending to show prior planning of the type that has been held to

be sufficient to support a conspiracy conviction in other cases. *State v. Colvin*, 90 N.C. App. 50, 57, 367 S.E.2d 340 344 (holding that evidence tending to show that Defendant participated in preparing for a robbery sufficed to support a conspiracy conviction), *cert. denied*, 322 N.C. 608, 370 S.E.2d 249 (1988). As a result, as the State concedes, the trial court erred by denying Defendant's motion to dismiss the charge that he conspired with Mr. Luckey to commit the crime of robbery with a dangerous weapon.

## B. Eyewitness Identification

Secondly, Defendant contends that the trial court erred by denying his motion to suppress all evidence tending to show that Mr. Jordan had identified him as the perpetrator of the crimes for which Defendant was convicted in a pretrial identification procedure; allowing Mr. Jordan to make an in-court identification of Defendant as the perpetrator of the crimes for which he was convicted; and by failing to instruct the jury to consider violations of the Eyewitness Identification Reform Act in assessing the credibility of Mr. Jordan's identification testimony. We do not find Defendant's arguments persuasive.

### 1. Motion to Suppress

In his initial challenge to the admission of evidence that Mr. Jordan identified him as the perpetrator of the robberies

and shootings both prior to and at trial, Defendant contends that certain of the findings of fact contained in the trial court's suppression order lacked sufficient evidentiary support and that the trial court's findings did not support its conclusions of law. Although we agree that a number of Defendant's challenges to the trial court's findings have merit and that one of the trial court's conclusions of law conflicts with the trial court's findings, we do not believe that Defendant is entitled to receive relief from the trial court's judgments as the result of the denial of his suppression motion.[2]

a. Hearing Evidence[3]

---

[2]As an initial matter, we note that Defendant's suppression motion merely alleged a violation of the provisions of N.C. Gen. Stat. § 15A-284.52 and that the argument advanced by Defendant's trial counsel at the conclusion of the suppression hearing was couched in essentially statutory terms as well. On the other hand, the argument advanced by the State at the conclusion of the suppression hearing focused on more traditional due process considerations. Although the trial court's order contains some language that reflects the sort of analysis required by the due process clause, that order is also primarily focused on the issue of whether the procedures that resulted in Mr. Jordan's identification of Defendant as the perpetrator of the robberies and shootings violated N.C. Gen. Stat. § 15A-284.52. As a result, Defendant's appellate counsel has advanced separate statutory and due process arguments in her brief, an approach that seems to us to be consistent with the manner in which the eyewitness identification issue was litigated in the court below. Thus, we will address the denial of Defendant's suppression motion on the basis of an analysis of the relevant statutory provisions, holding Defendant's due process argument for a later section of this opinion.

On 8 November 2010, Detective Glen Jenkins of the Monroe Police Department learned from a Crime Stoppers' tip that two individuals had information about the crimes in question that was not known to the general public, including the caliber of the weapon used in the commission of these crimes, the make and model of the vehicle that had been seen leaving the crime scene, and the identities of the persons whom investigating officers suspected of involvement in the commission of these crimes. At a meeting with Detective Jenkins, Ronald and Darius Phifer, who were related to Ms. Fulwiley, stated that Defendant and Mr. Luckey had been bragging about having committed the robberies and shootings. As a result, Detective Jenkins instructed Ginger Pope, an administrative employee who worked at the Monroe Police Department, to compile two six item photographic lineups, one of which contained Defendant's photograph and one of which contained Mr. Luckey's photograph.[4] According to Detective Jenkins, photos in the possession of the Division of Motor

---

[3]The evidence received at trial concerning the events that occurred in connection with the identification procedures challenged in Defendant's suppression motion was substantially similar to the evidence presented during the hearing held in connection with the consideration of Defendant's suppression motion.

[4]Although Detective Jenkins indicated in his notes that he had prepared the photographic lineup, he clarified this statement in his testimony by stating that he meant to say that he had ordered the preparation of the photographic lineup instead.

Vehicles were used in the photographic lineups because the investigating officers did not have another photograph of Defendant and because they wanted the backgrounds in each photograph included in the lineups to be identical.

On 9 November 2010, Detective Jenkins, Special Agent Gisela Jasmin Cruz of the State Bureau of Investigation, and Officer Vivian Nieves Caldwell of the Monroe Police Department went to the shopping center at which the crime had occurred for, among other things, the purpose of showing the photographic lineups to Mr. Jordan. The photographic lineups were presented to Mr. Jordan in a back room in the license tag agency that he and his wife operated.

At the time that the photographic lineups were shown to Mr. Jordan, Detective Jenkins and Special Agent Cruz "stood in the doorway" and "were not involved in the lineup." The actual identification procedure was conducted by Officer Nieves, who did not know the identity of the individuals suspected of committing the robberies and shootings. Although Detective Jenkins could see the process that Officer Nieves utilized in conducting the photographic lineup, he did not look inside the folders prior to the lineups, was unable to see which folder Officer Nieves presented to Mr. Jordan first, and could not see the actual photos or the markings on the folders while the

lineup was being conducted. Finally, Detective Jenkins denied that he had ever provided a description of the suspect upon whom their investigation had become focused to Mr. Jordan, suggested that Mr. Jordan should pick a particular photo out of the lineup that had been presented to him, or done anything else that would have focused Mr. Jordan's attention upon a particular photograph. As a result, Detective Jenkins asserted that he followed the procedures mandated by law during the process of the challenged identification procedure.

At the time that she presented the folders containing the photographic lineups to Mr. Jordan, Officer Nieves instructed Mr. Jordan that he was under no pressure to make an identification and that the exclusion of innocent individuals was just as important as identifying the actual culprits. As confirmation that he received and understood the information that Officer Nieves communicated to him, Mr. Jordan signed a statement indicating that he had received appropriate instructions concerning the purpose of the lineup and the manner in which it was to be conducted. In conducting the photographic lineup, Officer Nieves handed Mr. Jordan one folder at a time, let him look at each photo separately, and waited to see any reaction he would have, including statements made. In the event that Officer Nieves observed that Mr. Jordan reacted to a

particular photo, she would instruct him to focus on the photographs instead of some sort of an emotional reaction.

After viewing the photographic lineups, Mr. Jordan indicated that he could not identify anyone depicted in the folder that contained Mr. Luckey's image. However, Officer Nieves noticed that Mr. Jordan became nervous and unsteady at the time that he viewed Photograph No. 4 in the photographic lineup that contained Defendant's picture. Similarly, Detective Jenkins observed that, after picking up one of the photographs, Mr. Jordan began to shake and appeared to have recognized the individual depicted in the photograph that he was examining at that time. After putting the photograph down and looking at a number of additional photographs, Mr. Jordan looked at Detective Jenkins in frustration. In response, Detective Jenkins said, "all we need you to do is just pick the person out who you saw crossing the parking lot." However, neither Mr. Jordan nor Officer Nieves heard Detective Jenkins' comment. After making that comment, Detective Jenkins and Special Agent Cruz left the agency building while Mr. Jordan returned to one of the photos and made a selection.

Although Mr. Jordan expressed the desire to make sure that he identified the correct photograph and, for that reason, went back and forth between two photographs included in the lineup

that contained Defendant's photograph, he ultimately identified Defendant as a participant in the robberies and shootings. After Mr. Jordan selected Defendant's photograph from the lineup, Officer Nieves left the agency building to tell Detective Jenkins that Mr. Jordan had picked someone out of the lineup and showed him the photo. At that point, Detective Jenkins informed Officer Nieves that she needed to have Mr. Jordan indicate the extent to which he was certain that he had made a correct identification on a percentage basis. In response to Officer Nieves' inquiry, Mr. Jordan stated that he was seventy percent certain that he had correctly identified the perpetrator of the robberies and shootings. However, when asked to indicate the degree to which he was certain that he had made a correct identification on a scale of one to ten, he circled the number eight.[5]

Mr. Jordan claimed to have gotten a chill when he saw Defendant's photo while examining the relevant photographic lineup and stated that he had not needed to see any additional

---

[5]Contrary to Officer Nieves' statement to the effect that she had returned to ask Mr. Jordan about the extent of his confidence in the accuracy of his identification after speaking with Detective Jenkins, Detective Jenkins testified that Officer Nieves had already learned that Mr. Jordan rated his certainty about the correctness of his identification as eight on a scale of one to ten at the time that she came outside to tell him about the identification and that he asked Officer Nieves to get Mr. Jordan to give a percentage number after learning of his rating on the one to ten scale.

photographs before making an identification given his knowledge that Defendant was the person who had attacked and robbed him and his wife. In explaining his original statement to the effect that he was seventy percent certain that his identification of Defendant as the perpetrator of the robberies and shootings was correct, Mr. Jordan explained that he remembered from school that seventy percent was a passing score. He later told Officer Nieves that his level of confidence in the correctness of his identification was eight on a scale of ten on the grounds that, if "seventy was passing, . . . an eight out of ten . . . was pretty good odds." In a further attempt to clarify his position, Mr. Jordan testified that, in his view, seventy percent "was a very good percentage." After having initially picked Defendant out of the lineup, Mr. Jordan asked to see the lineup again; however, Mr. Jordan claimed that he had not really needed to take another look at the photographs in the lineup since he was certain of Defendant's involvement in the robberies and shootings.

In addition, Mr. Jordan testified that the weather was nice and it was still light outside at the time that he and his wife were attacked. Mr. Jordan remembered having seen Defendant's face twice, with the first view having occurred when Defendant was over by the wall prior to the attack and the second view

having occurred when Defendant turned to run away.  Mr. Jordan also testified that the descriptions of the suspect that had appeared in news reports were inaccurate given that, even though these news reports had stated that the suspect had dreadlocks, that was not actually the case.  In addition to his out-of-court identification of Defendant as one of his assailants, Mr. Jordan made an in-court identification of Defendant as one of the perpetrators of the robberies and shootings at issue in this case.

## b. Standard of Review

In considering the denial of a defendant's motion to suppress, this Court determines "only whether the trial court's findings of fact are supported by competent evidence, and whether these findings of fact support the court's conclusions of law."  *State v. Pulliam*, 139 N.C. App. 437, 439-40, 533 S.E.2d 280, 282 (2000).  The trial court's conclusions of law are, however, reviewed by this Court on a *de novo* basis.  *State v. Hernandez*, 170 N.C. App. 299, 304, 12 S.E.2d 420, 423 (2005).

## c. Validity of Defendant's Challenges to the Suppression Order

### i. Sufficiency of the Record Support for the Trial Court's Findings

In his initial challenge to the denial of his suppression motion, Defendant contends that a number of the trial court's

findings of fact lack adequate evidentiary support. Although we agree that Defendant's challenges to certain of the trial court's findings are valid, we do not believe that this deficiency in the trial court's order justifies a decision to award Defendant a new trial.

First, Defendant challenges the sufficiency of the evidence to support Finding of Fact No. 4, in which the trial court determined that the investigating officers "were aware of the procedures set out in the Eye Witness Reform Act." In support of this argument, Defendant directs our attention to Detective Jenkins' testimony that he was unaware that the "lineup law" had changed and that he was utilizing the "old law" and to other portions of the record. After carefully reviewing the record, we agree with Defendant's contention that the record evidence does not support a determination that Detective Jenkins, Special Agent Cruz, and Officer Nieves were aware of the requirements of the North Carolina Eyewitness Identification Reform Act. However, nothing in the relevant statutory provisions requires investigating officers to be aware of these relatively new statutory provisions. *See* N.C. Gen. Stat. § 15A-284.50 *et seq*. Instead, the relevant issue is whether the procedures utilized by the investigating officers complied with applicable statutory requirements. As a result, we cannot conclude that the

inclusion of this unsupported finding justifies an award of appellate relief. *E.g.*, *State v. Clark*, 107 N.C. App. 184, 191, 419 S.E.2d 188, 192 (1992) (holding that a "finding of an aggravating factor for [a] misdemeanor conviction . . . was superfluous and non-prejudicial error").

Secondly, Defendant argues that the trial court erred by stating in Finding of Fact No. 9 that Special Agent Cruz was in an "adjoining room" and that Detective Jenkins had stated "[r]emember the parking lot" to Mr. Jordan during the identification procedure. Once again, Defendant's arguments have merit. Special Agent Cruz testified that both she and Detective Jenkins were standing in the doorway while the photographic lineup was being conducted. In addition, Detective Jenkins testified that he told Mr. Jordan that "all we need you to do is just pick the person out who you saw crossing the parking lot," at which point Mr. Jordan selected a photograph of Defendant. As a result of the fact that these portions of the relevant finding of fact lack adequate evidentiary support, we will now proceed to examine Defendant's challenges to the trial court's conclusions of law in light of the undisputed record evidence without taking the trial court's unsupported findings of fact into consideration. *State v. Phillips*, 300 N.C. 678, 685, 268 S.E.2d 452, 457 (1980) (stating that, "[i]f there is no

material conflict in the evidence on voir dire, it is not error to admit the challenged evidence without making specific findings of fact" since the necessary findings of fact "are implied from the admission of the challenged evidence") (citations omitted).

### ii. Validity of Trial Court's Conclusions of Law

In addition to disputing the sufficiency of the evidentiary support for certain of the trial court's findings of fact, Defendant also challenges the validity of certain of the trial court's conclusions of law. More specifically, Defendant contends that the trial court erred by concluding that the investigating officers complied with the procedures set out in N.C. Gen. Stat. § 15A-284.52(b) and that Mr. Jordan's out-of-court identification of Defendant as the perpetrator of the robberies and shootings did not result from an impermissibly suggestive identification procedure. We will address each of Defendant's challenges to the trial court's conclusions of law in turn.

According to Defendant, Detective "Jenkins and [Special] Agent Cruz violated EIRA procedures by standing in the doorway of the room where the lineup was being held" and by making certain statements to Mr. Jordan while the photographic lineup was being conducted. The purpose of the Eyewitness

Identification Reform Act is to ensure that lineups are conducted in a fair and reliable manner. N.C. Gen. Stat. § 15A-284.51 (stating that the purpose of the Act is to "help solve crime, convict the guilty, and exonerate the innocent in criminal proceedings by improving procedures for eyewitness identification of suspects"). In order to achieve that goal, N.C. Gen. Stat. § 15A-284.52(b)(13) provides that "[t]here shall not be anyone present during the . . . identification procedures who knows the suspect's identity, except the eyewitness and counsel as required by law." The uncontroverted evidence demonstrates that Detective Jenkins was aware of Defendant's identity at the time that Mr. Jordan viewed the photographic lineup. In addition, the fact that Detective Jenkins and Special Agent Cruz stood in the doorway leading to the room in which the photographic lineup was being shown to Mr. Jordan amounted to their being "present" during the identification procedure. Finally, the statement that Detective Jenkins made during the identification procedure was certainly inconsistent with the requirement that "[n]othing shall be said to the eyewitness regarding the suspect's position in the lineup or regarding anything that might influence the eyewitness' identification." N.C. Gen. Stat. § 15A-284.52(b)(11). As a result, the trial court erred by concluding as a matter of law

that the investigating officers complied with N.C. Gen. Stat. § 15A-284.52(b) during the identification procedure in which Mr. Jordan selected Defendant's photograph and named him as the perpetrator of the robberies and shootings.

The mere fact that investigating officers violated one or more of the provisions of N.C. Gen. Stat. § 15A-284.52(b) does not necessitate a determination that the trial court erred by denying Defendant's suppression motion. Instead, N.C. Gen. Stat. § 15A-284.52(d)(1) provides that a "[f]ailure to comply with any of the requirements of this section shall be considered by the court in adjudicating motions to suppress eyewitness identification." As a result of the fact that the investigating officers' alleged violations of N.C. Gen. Stat. § 15A-284.52(b) represent the only basis upon which Defendant sought the suppression of the challenged identification evidence in the court below, we assume that the Defendant's suppression motion was predicated upon the assertion that the challenged evidence had been obtained as the result of a substantial violation of Chapter 15A of the North Carolina General Statutes and will analyze the validity of the trial court's decision to deny Defendant's suppression motion accordingly.

According to N.C. Gen. Stat. § 15A-974(a)(2), evidence should be suppressed if "[i]t is obtained as a result of a

substantial violation of the provisions of this Chapter," with the required substantiality determination to be based upon a consideration of all of the relevant circumstances, including "[t]he importance of the particular interest violated," "[t]he extent of the deviation from lawful conduct," "[t]he extent to which the violation was willful," and "[t]he extent to which exclusion will tend to deter future violations of this Chapter." A careful examination of the record in light of factors made relevant by N.C. Gen. Stat. § 15A-974(a)(2) establishes that the violations of N.C. Gen. Stat. § 15A-284.52(b) committed by the investigating officers at the time of the challenged identification procedure were not "substantial." Although any decision to exclude the challenged evidence would have a tendency to deter future statutory violations, the fact that the photographs were shown to Mr. Jordan by an individual who did not know which photograph depicted the subject in which the officers were interested, the fact that Detective Jenkins could not tell when Mr. Jordan was viewing Defendant's photograph, the fact that Detective Jenkins' unfortunate statement did not have a tendency to suggest that Mr. Jordan should select a particular photograph, and the fact that neither Officer Nieves nor Mr. Jordan heard Detective Jenkins' comment indicates that the deviation from statutorily required conduct that occurred in

this instance was not great, that the statutory violations that occurred in this instance were not willful, and that Detective Jenkins' conduct did not materially increase the likelihood that Mr. Jordan would select Defendant's photograph from the lineup shown to him by Officer Nieves as compared to that of someone else. As a result, we hold that the trial court did not err by denying Defendant's suppression motion.

## 2. Suggestiveness of Identification Procedures

Secondly, Defendant contends that the admission of evidence concerning Mr. Jordan's in-court and out-of-court identification of Defendant as the perpetrator of the robberies and shootings violated his due process rights. More specifically, Defendant contends that the trial court should have excluded Mr. Jordan's identification testimony given that the procedures utilized at the time that he made his out-of-court identification of Defendant as the perpetrator of the robberies and shootings were impermissibly suggestive and that his limited opportunity to see the suspect, the occurrence of other events that would have distracted his attention, the generality of his description of the suspect in the immediate aftermath of the shootings and robberies, and his lack of certainty about the accuracy of his identification established the existence of a substantial

likelihood that he had not made a correct identification. Once again, we conclude that Defendant's argument lacks merit.[6]

According to prior pronouncements of the Supreme Court, "[i]dentification evidence must be excluded as violating a defendant's right to due process where the facts reveal a pretrial identification procedure so impermissibly suggestive that there is a very substantial likelihood of irreparable misidentification." *State v. Harris*, 308 N.C. 159, 162, 301 S.E.2d 91, 94 (1983). In making this determination, we must first determine whether the pretrial identification procedure was impermissibly suggestive and then examine whether the use of such an impermissibly suggestive procedure created a substantial likelihood of irreparable misidentification. *State v. Fowler*, 353 N.C. 599, 617, 548 S.E.2d 684, 697 (2001), *cert. denied*, 535 U.S. 939, 122 S. Ct. 1322, 152 L. Ed. 2d 230 (2002). A pretrial identification procedure is impermissibly suggestive if it,

---

[6]As a result of the fact that Defendant failed to advance a due process argument in the court below and failed to object to Mr. Jordan's in-court identification of Defendant as the perpetrator of the robberies and shootings at trial, we are required to address Defendant's due process argument using a "plain error" standard of review, under which an award of appellate relief requires a showing that, "absent the [challenged] error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993). By definition, a convicted criminal defendant is not entitled to relief on "plain error" grounds in the event that no error of law was involved in the admission of the challenged evidence or the delivery of the challenged instruction.

under the "'totality of the circumstances,'" was "'so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice.'" *Id.*, 353 N.C. at 618, 548 S.E.2d at 698 (quoting *State v. Hannah*, 312 N.C. 286, 290, 322 S.E.2d 148, 151 (1984)). A determination that a particular identification procedure created a substantial likelihood of irreparable misidentification depends upon an analysis of the totality of the circumstances, including the witness' opportunity to view the suspect at the time of the crime, the witness' level of attention during the commission of the crime, the accuracy of the witness' prior description of the suspect, the witness' level of certainty at the time of the challenged identification procedure, and the length of time that had elapsed between the commission of the crime and the time at which the challenged identification was made. *State v. Pigott*, 320 N.C. 96, 99-100, 357 S.E.2d 631, 633-34 (1987).

Although Defendant appears to assume that a violation of N.C. Gen. Stat. § 15A-284.52(b) compels the conclusion that the identification procedure utilized in this instance was unnecessarily suggestive, we are not persuaded that this assumption is correct. As we have already noted, a reviewing court is simply required to "consider" whether an identification

procedure failed to comply with the provisions of N.C. Gen. Stat. § 15A-284.52(b) in determining whether a suppression motion should be allowed. Nothing in N.C. Gen. Stat. § 15A-284.52(d) indicates that the mere existence of a statutory violation, standing alone, necessitates a determination that the resulting identification procedure was impermissibly suggestive. As a result, we must make an independent determination of the extent to which the challenged identification procedure was impermissibly suggestive while giving due weight to the fact that the record reveals the existence of several violations of the procedures mandated by N.C. Gen. Stat. § 15A-284.52(b).

As we understand the undisputed evidence contained in the present record, the identification procedure utilized in this case, while not ideal, was not impermissibly suggestive. Although Detective Jenkins was present during the presentation of the photographic lineups to Mr. Jordan, the actual presentation was made by Officer Nieves, who did not know that her fellow officers had focused their attention upon Defendant. In addition to the fact that Officer Nieves, rather than Detective Jenkins, actually presented the folders containing the photographic lineups to Mr. Jordan, the undisputed record evidence establishes that Detective Jenkins did not know the order in which the photographs would be presented to Mr. Jordan

and could not see which photograph Mr. Jordan was examining at any point during the lineup process. Finally, although the undisputed evidence reflects that Detective Jenkins stated that Mr. Jordan should select the person that he saw in the parking lot during the identification procedure, we do not understand this statement to amount to a suggestion that Mr. Jordan was required to make an identification from the photographs that had been presented to him or that he should select a particular photograph. Finally, we note that both Mr. Jordan and Officer Nieves testified that they did not hear Detective Jenkins make the comment in question. As a result, we are unable to conclude that "the facts reveal[ed the use of] a pretrial identification procedure [that was] so impermissibly suggestive that there [was] a very substantial likelihood of irreparable misidentification," *Harris*, 308 N.C. at 162, 301 S.E.2d at 94, a determination that requires us to reject Defendant's due process challenge to the admission of evidence concerning Mr. Jordan's in-court and out-of-court identifications of Defendant as the perpetrator of the robberies and shootings.

### 3. Jury Instructions

Finally, Defendant contends that the trial court erred by failing to instruct the jury concerning the manner in which it should evaluate the eyewitness identification testimony

contained in the record as required by the relevant statutory provisions. We do not believe that Defendant is entitled to relief from the trial court's judgments on the basis of this contention.

According to N.C. Gen. Stat. § 15A-284.52(d)(3), a "jury shall be instructed that it may consider credible evidence of compliance or noncompliance to determine the reliability of eyewitness identifications" "[w]hen evidence of compliance or noncompliance with the requirements of this section has been presented at trial." Although the trial court did not instruct the jury in accordance with N.C. Gen. Stat. § 15A-284.52(d)(3), Defendant failed to either request the delivery of such an instruction or object to the trial court's instructions as delivered. Although Defendant argues that we are entitled to consider his appellate challenge to the trial court's failure to deliver an identification instruction in accordance with N.C. Gen. Stat. § 15A-284.52(d)(3) under either a traditional harmless error standard or on the basis of a plain error standard of review, we need not resolve the issue of whether Defendant adequately preserved this issue for appellate review given our conclusion that Defendant is not entitled to an award of appellate relief under either approach.

As we have already noted, the purpose of the Eyewitness Identification Reform Act is to ensure that pretrial identification procedures are conducted in a fair and reliable manner. N.C. Gen. Stat. § 15A-284.51. According to N.C. Gen. Stat. § 15A-284.52(d)(3), the purpose of requiring a jury instruction of the type at issue here is to assist the jury in "determin[ing] the reliability of eyewitness identifications." After carefully reviewing the record, we are unable to conclude that there is any reasonable possibility that the outcome at Defendant's trial would have been different in the event that an instruction of the nature mandated by N.C. Gen. Stat. § 15A-284.52(d)(3) had been delivered. N.C. Gen. Stat. § 15A-1443(a) (stating that "[a] defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial court of which the appeal arises"). Aside from the fact that the record fails to demonstrate any substantial deficiency in the identification procedures at issue in this case, the record contains substantial additional evidence tending to identify Defendant as the perpetrator of the robberies and shootings, including his access to a Dodge Charger, the spending spree in which he

engaged shortly after 1 November 2010, his admission that he had been involved in a robbery and a shooting, the discovery of items taken in the robbery in his possession and that of Mr. Luckey, and the presence of Ms. Jordan's blood on Defendant's clothing. As a result, we conclude that Defendant is not entitled to any relief from the trial court's judgments based upon the trial court's failure to instruct the jury in accordance with N.C. Gen. Stat. § 15A-284.52(d)(3).

## III. Conclusion

Thus, for the reasons set forth above, we conclude that, while the trial court erred by failing to grant Defendant's motion to dismiss the conspiracy charge for insufficiency of the evidence, Defendant's request for relief from his remaining convictions on the basis of the admission of evidence concerning Mr. Jordan's in-court and out-of-court identifications of Defendant as the perpetrator of the robberies and shootings and the trial court's failure to instruct the jury in accordance with N.C. Gen. Stat. § 15A-284.52(d)(3) lack merit. As a result, the trial court's judgment in the case in which Defendant was convicted of conspiracy to commit robbery with a dangerous weapon should be, and hereby is, vacated, and the trial court's remaining judgments should, and hereby do, remain undisturbed.

NO ERROR IN PART; VACATED IN PART.

Judges GEER and STEPHENS concur.

Report per Rule 30(e).